[No. 6444.   Decided January 5, 1907.]

THE STATE OF WASHINGTON, *On the Relation of Kenneth Mackintosh, Prosecuting Attorney, Appellant,* v. THE SUPERIOR COURT FOR KING COUNTY, *Respondent.*[1]

APPEAL—RESERVATION OF GROUNDS. Errors committed upon an inquisition of lunacy cannot be reviewed where no exceptions were taken.

PROHIBITION—NATURE AND SCOPE. Prohibition does not lie to correct errors in matters of procedure where jurisdiction exists.

CRIMINAL LAW—TRIAL—INSANITY AT TIME OF TRIAL—JURISDICTION. Under the constitution, a person charged with crime cannot be put on trial while insane; and under the rule of the common law, the courts of this state have inherent power, irrespective of Bal. Code, § 2660, to determine the question of insanity by an examination conducted by a commission appointed by the court (MOUNT, C. J., and FULLERTON, J., dissenting).

SAME—HEARING. Upon a suggestion of the present insanity of persons charged with crime, it is not necessary that the affidavits allege, as provided by Bal. Code, § 2660, that the defendants were at large or unsafe to be at large, as the power to proceed exists under the common law irrespective of the statute.

INSANE PERSONS—CUSTODY AND SUPPORT—NONRESIDENTS—DEPORTATION. Laws 1905, p. 253, directing the deportation, to their legal residences, of nonresidents who are adjudged insane, is invalid for the reason that it cannot be enforced.

APPEAL—REVIEW. The invalidity of a statute may be declared upon appeal, although not raised by either party to the appeal, where a question is raised that might disturb friendly relations with a sister state (ROOT, J., dissenting).

CRIMINAL LAW—INSANE PERSONS—CONFINEMENT. The statute directing the deportation of nonresidents who are adjudged insane does not apply to persons charged with crime who have not yet been placed on trial, as they should be detained within the jurisdiction to answer to the charge in case they become sane.

Application filed in the supreme court September 24, 1906, for a writ of prohibition to prevent the superior court for King county, Frater, J., from adjudging the insanity and di-

[1]Reported in 88 Pac. 207.

recting the deportation of two nonresidents. Granted in part, and denied in part.

*Kenneth Mackintosh, George F. Vandervecr*, and *John F. Miller*, for relator.

*W. A. Holzheimer, Baxter & Wilson, A. E. Clark, Walker & Munn*, and *Anthony M. Arntson*, for respondent.

*The Attorney General*, as *Amicus Curiae.*

Crow, J.—This is an application for an original writ of prohibition to prevent the superior court of King county, and Honorable A. W. Frater, as one of the judges thereof, from signing an order adjudging one Maud Creffield and one Esther Mitchell to be insane, and directing their deportation to their respective homes in the state of Oregon. · Although not disclosed by the record, the following facts, stated on the argument by counsel for the relator and admitted as true by counsel for the respondent, will materially aid in an understanding of the situation. One Joshua Creffield, then the husband of the above-mentioned Maud Creffield, was shot and instantly killed upon the streets of Seattle by one George Mitchell. The latter was apprehended, and upon an information charging him with murder, was tried, and acquitted on the ground of insanity. A few days thereafter, his sister, the above-mentioned Esther Mitchell, shot and instantly killed him.

The record shows that afterwards, on July 18, 1906, Kenneth Mackintosh, the relator herein, as prosecuting attorney of King county, by information, charged Esther Mitchell and Maud Creffield with the crime of murder; that they were immediately arrested, and have ever since been confined in the jail of King county; that being arraigned, they pleaded not guilty, and by their counsel demanded separate trials; that the case of Esther Mitchell was set for trial on September 24, 1906; that after such setting and on September 10, 1906, while Esther Mitchell and Maud Creffield were in jail, one

Frank Hurt filed and presented to the respondent, A. W. Frater, affidavits setting forth that Maud Creffield and Esther Mitchell were then insane, and praying that they be taken before the respondent for examination; that the relator, as prosecuting attorney of King county, objected to the filing of the affidavits and application, and also to the appointment of any commission to examine as to the sanity of the prisoners; that these objections being overruled, and no jury having been demanded, a lunacy commission, consisting of three licensed physicians, was appointed; that the respondent directed the commission to make a full and complete investigation, and to permit the prosecuting attorney or his deputy to be present and offer any suggestions or present such evidence as he might desire; that the hearing and examination conducted by the commissioners extended over a period of several days, during all of which time the prosecuting attorney or his deputy was present, except when private physical examinations of the women were made, and while the matron of the jail was examined on delicate questions as to sexual symptoms and conditions of the women, and while two physicians testified, they having declined to give their evidence in public; the same being of a confidential, privileged, and private nature; that during a portion of the time, the examinations were conducted in the judge's chambers while he was attending to other public business in the adjoining courtroom, he coming into his chambers from time to time; that the commission, after completing the examination, reported in writing to the respondent that both of the women were then insane, having that form of insanity commonly classified as "paranoia," which has its origin in structural defects of the nervous system; that each of them had homicidal, suicidal, and incendiary tendencies, and that it was dangerous for them to be at large. Thereupon the respondent Judge announced that he would enter a decree adjudging them to be insane, and directing the sheriff to deport them to Oregon, the state

of which they were residents, but that he would defer signing
or entering such order until the prosecuting attorney had
ample time to apply to this court for a writ of prohibition,
or take such other steps as to him might seem advisable.
Shortly thereafter this application was made.  The respond-
ent Frater, by way of return, has interposed a motion to
quash, a demurrer, and an answer.  As to the material facts
involved there is no particular dispute, the controlling issues
being those of law.

Although strong reasons, based upon propriety, decency,
and public policy, commend the action of the commission in
taking the evidence of the matron and two physicians and
in conducting the physical examination of the women in pri-
vate, we are not called upon at this time to determine whether
such proceedings were erroneous.  As to said matters and
others affecting methods of procedure of which the relator
now complains, the record fails to disclose that he made any
objections or took exceptions.  In the absence of exceptions,
such alleged irregularities, even if erroneous, could not be
reviewed on appeal or by certiorari.  In this proceeding they
could in no event be reviewed or corrected, even had excep-
tions been taken.  The function of a writ of prohibition is to
arrest proceedings which are without, or in excess of, juris-
diction, and not to review errors in matters of procedure
where jurisdiction exists.

Respondent contends that, when in good faith an affidavit
has been filed alleging that a defendant charged with a capital
offense is insane, and when it appears to the court that there
are reasonable indications of probable insanity, it is within
the power of the court to determine the issue of the sanity
of the accused before putting him on trial for his life; in
other words, that the court may first determine whether such
defendant is insane at the then present time.  We think this
position is well taken, and that the court is possessed of the
inherent power and jurisdiction to conduct such inquiry with-
out regard to statutory authority therefor.  The law on this

subject is tersely stated in 22 Cyc., at page 1213, in the following words:

"At common law, and in some jurisdictions by express statutory provision, if a person is insane when arraigned for a crime, he cannot be required to plead or to be tried, whether he was insane when he committed the act or not; but the court, provided there are indications of a showing of probable insanity, should determine such issue, either itself or by a jury or commission, according to the statute or practice, and if he is found to be insane, remand him to jail, or, when authorized by statute, commit him to an asylum or hospital until his recovery. So, also, if the accused becomes insane during the trial, the proceeding must stop; and if he becomes insane after conviction, judgment cannot be given or sentence pronounced so long as he is in such condition; nor can he be executed if he becomes insane after judgment and sentence."

The foregoing text is well sustained by many English and American cases cited in the notes.

In this instance the respondent, in the exercise of his inherent powers as a judge, proceeded himself and by a commission to determine the sanity or insanity of these women, and in the procedure adopted, endeavored to comply with the provisions of Bal. Code, § 2660 (P. C. § 5546). Knowingly placing an insane person on trial for a crime punishable by death is a procedure not to be tolerated by the courts of any civilized nation. The fifth and fourteenth amendments to the constitution of the United States, and § 3 of art. 1 of the constitution of this state provide that no person shall be deprived of life, liberty, or property without due process of law. Murder in the first degree is punishable by death. If a person while insane were to be tried and convicted upon a charge of murder, and afterwards executed, would it be contended that he had been deprived of his life by due process of law? These two women were, or they were not, insane at the time of the filing of the affidavits. The respondent doubtless regarded the indications of their insanity as sufficient to restrain him from placing them on trial for their lives until

their then present mental condition could be ascertained.   A
person should certainly be in possession of his mental facul-
ties when upon trial for his life.   Mr. Carr, in his work
(Trial of Lunatics) on the suggestion of insanity in crim-
inal cases, and the trial of the collateral issue, at page 44
in note 1, says:

"The constitution of the United States, 1787, provides,
amendments, Art. V., that no person shall be deprived of life,
liberty, or property, without due process of law; and the
constitution of Pennsylvania, both in 1790, Art. IX., and in
that of 1874, Art. I., declared that the accused cannot be
deprived of his life, liberty, or property, without the judg-
ment of his peers or the law of the land, and it may be said
the provisions as to trials for crimes, and the rights of de-
fendants in criminal cases indicate that they contemplated
the common-law rule, that it was the right of a prisoner not
to be tried if he were insane.   Sanity of the prisoner may be
said to be the postulate of such constitutional provisions.
Moreover, the two phrases, the law of the land, and due
process of law, are synonymous, and their meaning is that
such principles in the administration of law as were in force
under the common law in England, at the time when the con-
stitution of the United States or the constitution of Penn-
sylvania was adopted, became part of the American law by
force of those constitutional enactments."

The sixth amendment to the constitution of the United
States guarantees that the accused in all criminal prosecu-
tions shall be informed of the nature and cause of the accusa-
tion against him, and have the assistance of counsel for his
defense.   How can an insane person be informed of the nature
and cause of the accusation against him, or how could he
employ counsel to assist him in his defense?   Of what avail
are these and other constitutional guaranties if an accused
can be placed on trial while he is actually insane?   In *State
v. Williams*, 18 Wash. 47, 50 Pac. 580, 63 Am. St. 869, 39
L. R. A. 821, this court reversed a judgment of conviction
for burglary because the defendant was brought into court
and there kept in manacles until, upon the protest of his

counsel, the manacles were finally removed, but not until after a considerable portion of time had elapsed. In the course of the opinion we said:

"Section 22, art. 1, of our constitution, declares that, 'In criminal prosecutions the accused shall have the right to appear and defend in person.' The right here declared is to appear with the use of *not only his mental but his physical faculties unfettered,* and unless some impelling necessity demands the restraint of a prisoner to secure the safety of others and his own custody, the binding of the prisoner in irons is a plain violation of the constitutional guaranty."

If a prisoner with his hands or feet manacled cannot have a fair trial, within the meaning of the constitution, how can it be contended that he can have such fair trial when his mind is fettered? No part of the trial of a defendant charged with a capital offense can be conducted in his absence. His personal presence in court is at all times indispensable. But of what avail would his bodily presence be if his mental faculties were gone? It will not do to say that the question of his condition of sanity or insanity may be tried or determined with other issues in the case. He may have been sane at the date of the alleged crime, and insane at the date of the trial, or the reverse. As early as 1765, Sir William Blackstone, in his Commentaries, book 4, chapter 2, at page 25, said:

"Also, if a man in his sound memory commits a capital offense, and before arraignment for it, he becomes mad, he ought not to be arraigned for it; because he is not able to plead to it with that advice and caution that he ought. And if, after he has pleaded, the prisoner becomes mad, he shall not be tried; for how can he make his defense? If, after he be tried and found guilty, he loses his senses before judgment, judgment shall not be pronounced; and if, after judgment, he becomes of nonsane memory, execution shall be stayed; for peradventure, says the humanity of the English law, had the prisoner been of sound memory, he might have alleged something in stay of judgment or execution."

In 1790, in *Rex v. Frith*, 22 How. St. 700, a preliminary trial of the prisoner's mental ability to plead was had by a court of criminal jurisdiction, and the prisoner, on being found insane, was ordered remanded and removed from the bar. On July 18, 1800, the common law rule that no insane man shall be put on trial was incorporated in section 2 of the act of 29 and 40, Geo. III, c. 94, and the same will now be found in the statutes of many of the American states, although we have no such statute in Washington.

Upon a trial for murder the only insanity that can be pleaded as a defense must have existed at the date of the alleged crime. Suppose it was apparent that, when called for trial, the defendant in a murder case was a raving maniac. Would it be contended that a court of justice in any civilized country would proceed with his trial on the indictment or information presented against him? Such a suggestion would be shocking to every sense of humanity. Still, one not so violent might be equally insane, and the trial should proceed no more in the one case than in the other. There is no statute directing that a person while insane may be tried for murder. Such a statute, if enacted, would be in conflict with the Federal and state constitutions and the well-established principles of the common law. Criminal courts are possessed of an inherent power to ascertain whether one accused of crime is sane and able to avail himself of all his constitutional rights during the progress of his trial. The respondent Judge having such power, exercised it, before placing these women on trial. In so doing he endeavored to proceed in substantial compliance with Bal. Code, § 2660 (P. C. § 5546), that being the most pertinent statute we have upon the subject. Insanity not only protects an accused from conviction for crime, but present insanity when established also affords sufficient reason why he should not be placed on trial or, if he has been tried, convicted, and sentenced, why the judgment of the court should not be executed upon him. In

*Flanagan v. State,* 103 Ga. 619, 30 S. E. 550, it appeared that the defendant, when arraigned on a charge of murder, filed a special plea of insanity, alleging that he was insane. Under §§ 951 and 953 of the penal code, a jury, empaneled to try the issue thus raised, returned a verdict finding him sane. Several months later, when called for trial upon the charge of murder, he again interposed the special plea of insanity, and insisted that, under the code, he was entitled to another trial of that issue, which he then demanded. The court refused his demand and he was convicted. On appeal he contended the trial court erred in declining to grant him a trial on his second special plea of insanity. After holding that his statutory right had been exhausted, the supreme court said:

"It is, however, possible, and in some cases probable, that a person sane at the time of the trial of the special issue may, where his case is continued for any length of time, become insane to such an extent as to lack mental capacity to understand the nature of the proceedings against him, realize his peril, assist his counsel, etc. In such a case the accused would not be forced to trial upon the merits simply because a jury had, at a previous term of court, declared him then sane. His statutory rights under the code sections above cited would have been exhausted, but resort could still be had to his common-law remedies. Under the common law, when a suggestion of insanity was made upon arraignment, the judge always investigated the case and determined for himself whether the accused had sufficient mental capacity to go to trial. We think, therefore, that even after a jury had passed upon the plea of insanity at the time of trial and had determined it against the accused, where it is suggested to the judge that since the time of such finding the mind of the accused has materially changed and that he is now in such a mental condition as that he should not be put upon trial, the judge should make the proper investigation to ascertain the truth of the suggestion. He may do this in any right and proper manner,—by impaneling another jury if he deem it best to do so, by considering the affidavits of experts, by a personal examination and inspection, or otherwise."

We have no statute in this state similar to the Georgia code, hence the common law rule, so well stated in the above quotation, must apply here.

In *Youtsey v. United States*, 38 C. C. A. 562, 97 Fed. 937, the second syllabus reads as follows:

"The federal courts are governed by the practice at common law as to the method of trying an issue of the present insanity of a defendant, where the objection is urged in bar of his trial; and by such practice the defendant is not entitled to a jury as a matter of right, but the judge may, in his discretion, call a jury, or determine the issue himself, upon his own inspection of the defendant, and such testimony as he may choose to take, or he may direct the question to be tried by the jury with the plea of not guilty."

This case contains a very able discussion of common law principles which we regard as applicable here. See, also, *Webber v. Commonwealth*, 119 Pa. St. 223, 13 Atl. 427, 4 Am. St. 634.

The relator, however, contends that the respondent was without jurisdiction to proceed under § 2660, *supra*, because the affidavits did not allege that these women were at large or unsafe to be at large. We think there is no merit in this suggestion. The language of the statute is not such as to confine an inquiry to persons then actually at large, but also contemplates all persons *unsafe to be at large*. Moreover, the absence of these allegations would not deprive the court of its inherent power to proceed under the rules of the common law. This the respondent in effect did, and reached the conclusion that Maud Creffield and Esther Mitchell were both insane. He thereupon announced his intention of making an order and decree finding them insane. It being within his jurisdiction so to do, the relator's application, in so far as it demands a writ to prohibit such order and decree, will be denied.

The respondent, having reached the conclusion that Maud Creffield and Esther Mitchell were both insane, announced

that, under chapter 138, page 253, Laws of 1905, he was about to enter an order directing their deportation to their residence in the state of Oregon. We will now consider the validity of that statute. This question was not presented to the trial judge, nor was it directly raised by the relator or respondent in this court. It occurred to us while in consultation. Being a question of public importance which might disturb friendly relations with a sister state, the majority of this court believed that it should be carefully considered. Thereupon the relator, the respondent, and the attorney general were requested to present briefs upon the validity of the statute. From an examination of the briefs furnished, and from such further researches as we have been able to make, we can find but few adjudicated cases bearing upon this proposition. Such as we do find lead to the conclusion that the statute is nugatory, for the reason that legally it cannot be fully enforced. By this statute it is made the duty of the sheriff to convey the insane person to his home in another state. He could exercise no official authority or functions beyond the limits of the state of Washington. Anything done by him with the deported patients after our state lines had been crossed would be without authority, as our statutes can have no extra-territorial force. In *Overseers of Georgia v. Overseers of Grand Isle*, 1 Vt. 464, the court, referring to the removal of a pauper, at page 466, said:

"Any provision for removing out of the state would be a nullity, and as such would be resisted by the other state."

In *Overseers of Limestone v. Overseers of Chillisquaque*, 87 Pa. St. 294, at page 298, the court said:

"It is indeed true that, by our poor laws, provision is made for the removal of paupers into other states, but this provision is nugatory in that there is no power by which it can be carried into effect; hence, the order of removal loses all force the moment it crosses the state line. In other words, the legislature of Pennsylvania cannot charge the poor districts of other states with the support of paupers, though

their settlements may properly be therein, and *per contra,* other states cannot so charge the poor districts of Pennsylvania."

In *Overseers of Parker City v. Overseers of Du Bois Borough* (Pa.), 9 Atl. 457, the court said:

"It is well settled by authority that the present residence of either of the parents of the said Weller Keyser cannot be considered in determining this question. Both reside out of the commonwealth, and we have no power to send the pauper beyond the limits of the state."

Ordinarily where a statute is found to be impotent or invalid as to its principal feature or purpose, it is held to be void *in toto.* It is urged that we should not depart from our usual rules by considering a question not raised by either party; that we should hesitate to inquire into the validity of this statute which has not been attacked. Believing its validity to be directly involved in this proceeding, we have deemed it our duty, for the reasons above suggested, to pass upon this question, and have concluded that the deportation statute, being incapable of lawful enforcement in its principal features and purposes, is invalid. We therefore feel constrained to let the writ issue against that portion of the respondent's proposed order directing deportation of these women. There is a further reason why these women should not be deported to another state. The statute does not refer to insane persons against whom informations for crime are pending. These women stand charged with a crime for which they have not yet been placed on trial. They should be restrained within the jurisdiction of this state so that, if they hereafter become sane, they may be subject to the further orders of the court.

"Since the insanity of a defendant at the time of arraignment, during trial, after conviction, or after judgment, does not prevent his trial, sentence, or punishment, as the case may be, if he subsequently becomes sane, the court may at any time, even without the aid of a statute, cause him to be brought before it for an inquiry as to his sanity with a view

to further proceedings if he be found to be sane, and such inquiry may be had as often as the court may deem necessary. In many jurisdictions provision for such inquiry is now made and the practice regulated by statute." 22 Cyc. 1217; *State v. Pritchett*, 106 N. C. 667, 11 S. E. 357.

Just as this opinion was about completed, the attorneys for the relator and the respondent jointly filed in this court a suggestion of the death of Maud Creffield, stating that since the argument herein she had committed suicide on the 16th day of November, 1906, as duly certified by the coroner of King county, and therefore as to any proceedings relative to said Maud Creffield, this proceeding will have to be dismissed.

It is ordered that a writ be issued prohibiting the respondent from making any order deporting the said Esther Mitchell. In all other respects the writ demanded is denied.

It is further ordered that the respondent recover costs against the state.

Dunbar, Hadley, and Rudkin, JJ., concur.

Root, J. (concurring in part)—I concur fully with the majority as to the trial court's right to appoint the lunacy commission and adjudge the two women insane. Regarding the validity of the deportation statute, I express no opinion, as neither party requested either the trial court or this to decide that question. The fact that many—probably a majority—of the states have, and are enforcing, statutes of this character shows that there must be a somewhat general belief in their policy and validity. I doubt the propriety of adjudging a legislative act void except where the necessity is clear, and in a case where its validity is a *bona fide* issue.

Mount, C. J. (concurring)—I concur in the conclusion reached by the majority upon the second question decided, but I think the writ should issue upon both questions. If it be true that Bal. Code, § 2660, applies to this case, and that respondent had jurisdiction to determine the question of the

present insanity of the accused, independently of the crime charged, then that section prescribes the character of the trial which should have been followed. It does not authorize the appointment of a commission to try the question, and the court, therefore, had no authority to appoint such commission. The procedure adopted may be error which cannot be reviewed upon this application, because the state may review the error by writ of review or by appeal under the last clause of subdivision 7 of Bal. Code, § 6500. If so, the application should be denied upon that ground and not upon the merits. If the accused was insane at the time the alleged crime was committed, the question of sanity is then tried to a jury upon the general issue. Bal. Code, § 6959 (P. C. § 2208). This has been the uniform practice in this state since the beginning. The majority opinion seems to place the inherent power of the court above the statute, and makes a new practice in this state in this class of cases. I think the sections above referred to are not subject to the criticism that they do not afford due process of law. If they are subject to such criticism, then no insane man can be adjudged insane, because he cannot be informed of the nature of the accusation against him, and therefore cannot be tried at all. In my opinion, the writ should issue as prayed.

FULLERTON, J.—I concur in the conclusion reached by the chief justice.