[No. 19737.   Department One.   March 5, 1926.]

THE STATE OF WASHINGTON, *Respondent*, v. GINO SPADONI, *Appellant*.[1]

[1] HOMICIDE (27)—INDICTMENT—NECESSARY ALLEGATION—TIME OF DEATH FROM INJURY. Under Rem. Comp. Stat., § 2055, requiring that an information must contain a statement of the acts constituting the offense, and Id., § 2057, requiring that it be direct and certain as regards the crime charged, an information for murder must allege that death ensued within a year and a day from the infliction of the mortal wound.

[2] SAME (78)—EVIDENCE—SUFFICIENCY—IDENTIFICATION OF ACCUSED. In a prosecution for murder, it is competent, on the question of identity, to prove that the person committing the offense was of the general appearance of the accused, and that a person of his general appearance was seen in the vicinity immediately prior to the commission of the offense, and the witnesses so testifying may state whether, in their opinion, the person seen was the accused.

[3] SAME (46, 47)—NATURE OF ACT—COMMISSION OF OTHER OFFENSE —CONTEMPORANEOUS CIRCUMSTANCES. Under the rule that, in a homicide case, anything may be shown that will throw light on the matter, or disclose any fact from which an inference of guilt may be deduced, it is competent, as tending to show motive and a preconcerted plan, to prove attacks made upon another person who had discharged the accused by direction of the deceased, and that guns used in such attacks were of the same caliber as guns found in the brush along the trail of the assassin who committed the murder, and that the accused had a gun of the caliber of one of those found; it being competent to show other crimes when connected with the offense charged.

[4] WITNESSES (101)—SCOPE AND EXTENT OF CROSS-EXAMINATION—TO DISCREDIT WITNESS. In a prosecution for murder, where a reward had been offered for information leading to arrest and conviction, it is error to refuse to allow cross-examination to affect the credibility of a police officer, by showing that he had offered to split the reward with another, such officer having no right to accept a reward.

[5] SAME (57½)—EXAMINATION—INTERPRETERS. It is error to rebuke counsel for questioning the correctness of translations by an

¹Reported in 243 Pac. 854.

interpreter, and to state that the interpreter's mistakes can be corrected by cross-examination.

[6] SAME (127)—CORROBORATION—PREVIOUS CONSISTENT STATEMENTS. Upon testimony of an alibi, it is inadmissible to ask the witness the name of the first person to whom she told that the accused was seen elsewhere at the time the crime was committed, where there was no impeachment of the witness by proof that her testimony was of recent fabrication.

[7] SAME (99)—IMPEACHMENT OF KNOWLEDGE OR RECOLLECTION OF WITNESS. In a prosecution for murder, in which a witness testified that the accused admitted to witness that he had killed the deceased, the accused should be permitted to bring to the jury any circumstance, however slight, which tended to impeach the witness; and it is error to exclude evidence that the accused did make a statement, denied by the witness, to the effect that he had not known anything about the case.

[8] SAME (126-1)—CONTRADICTION—COLLATERAL MATTERS. The accused in a homicide case cannot be questioned as to collateral matters and then be impeached because he does not make true answers thereon.

[9] CRIMINAL LAW (243)—TRIAL—ARGUMENT OF COUNSEL—COMMENT ON COMMISSION OF OTHER OFFENSE. Where the court, in a prosecution for murder, allowed the state to exceed the bounds of proper cross-examination as to another and distinct crime, it is prejudicial error to overrule an objection to comment thereon by the prosecuting attorney, and to refuse to instruct the jury to disregard it.

[10] CRIMINAL LAW (276)—TRIAL—INSTRUCTIONS—ALIBI. In a prosecution for murder it is error to instruct the jury that the defense of an alibi may be "easily fabricated," and should be considered with "great caution and care" and "receive rigid scrutiny."

[11] SAME (318)—REQUESTED INSTRUCTIONS—MODIFICATION BY COURT. It is not error to refuse to give instructions in the language in which they are framed, if covered in the instructions given.

Appeal from a judgment of the superior court for Pierce county, Teats, J., entered July 13, 1925, upon a trial and conviction of homicide. Reversed.

*Bates & Peterson* and *S. A. Gagliardi,* for appellant. *J. W. Selden* and *Robert B. Abel,* for respondent.

FULLERTON, J.—The appellant Gino Spadoni, after a trial had in the superior court of Pierce county, was on the verdict of a jury adjudged guilty of the murder of one Harry Hallen, and sentenced to the state penitentiary for the term of his natural life. This appeal is from the judgment and sentence.

The crime of which the appellant was convicted was committed on one of the streets of the city of South Tacoma, on the night of March 11, 1921. At about 10:30 o'clock on the night of the date given, Hallen was returning to his home from a visit at the home of his father-in-law, when he was shot four times in the body and mortally wounded by some person, who had concealed himself behind a telephone pole standing on the margin of the street over which Hallen was passing. Hallen was rendered unconscious by the shots and did not recover consciousness prior to his death, which occurred some half an hour thereafter. Hallen was accompanied at the time by his wife, and she was the only immediate witness of the tragedy. She. too, was wounded by a shot fired by the assassin. The assassin left the scene of the tragedy immediately after the commission of the crime, and, although an investigation was immediately entered upon by the detective officers of the Tacoma police force, nothing was discovered pointing to the possible perpetrator of the crime for a considerable time after its occurrence. Just when the appellant was first suspected of being the perpetrator does not appear in the record. He was formally charged with the crime on April 10, 1925, nearly four years and one month after it had been committed, and when arrested was in San Francisco, in the state of California.

The appellant's learned counsel have, in their brief, made some thirty-eight assignments of error. Many of these are the result of the caution of counsel; a

single question is suggested in a number of different forms. A number, furthermore, relate to matters arising out of circumstances peculiar to the particular trial, which can only, by a remote possibility, again recur, and our conclusion on certain of the principal questions involved renders it unnecessary to notice them. In our discussion, therefore, we shall not refer to the several assignments in detail. Nor shall we, in the discussion of those we find necessary to notice, follow the order in which they are presented in the briefs.

The first assignment is that the information does not state facts sufficient to constitute a crime. The information (we quote from the copy as it appears in the transcript of the record), omitting the formal parts and the preliminary allegations, reads as follows:

"That the said Gino Spadoni in the county of Pierce, in the State of Washington, on or about the 11th day of March Nineteen hundred and 21, then and there being, unlawfully and feloniously and with a premeditated design to effect the death of Harry Hallen, a human being, did shoot a pistol loaded with powder and ball at and into the body of the said Harry Hallen, and thereby mortally wounding the said Harry Hallen, from which mortal wounds the said Harry Hallen did die; and that such killing of the said Harry Hallen as herein alleged was neither excusable nor justifiable . . . ."

The objection to the information is, that it does not appear therefrom that the death of the person alleged to have been shot and mortally wounded ensued within a year and a day from the time of the infliction of the mortal wound. It is the rule of the English common law that, to constitute felonious homicide, the death of the person receiving a mortal wound must ensue within a year and a day from the time of the infliction of the wound. The rule was regarded as a matter of sub-

stance material to the issue. If the death did not ensue within the prescribed time, the offense was not a felony, as the common law conclusively presumed that the wound was not the cause of death, and proofs were never admitted to show to the contrary. Wharton on Homicide (3 ed.), p. 19; 29 C. J. 1083; 8 R. C. L. 801; 15 R. C. L. 747; *Louisville, E. St. Louis R. Co. v. Clarke*, 152 U. S. 230, 1 c. 239. The same rule prevails in the American states, where there is no statute to the contrary. *State v. Dailey*, 191 Ind. 678, 134 N. E. 481, 20 A. L. R. 1004, and note, p. 1006. And such also is the rule as it is announced by the supreme court of the United States. *Ball v. United States*, 140 U. S. 118.

[1] The time of the death being an essential element of the crime, it is the general rule that the time must be alleged in the indictment or information. In the American jurisdictions, at least, no particular form of allegation is required. It is sufficient to state facts showing that the death was instantaneous, or that the wound was inflicted on a certain date and that the victim died on a later certain date, or that the wound was inflicted on a certain date and that the victim died within a year and a day from the infliction of the wound, but it is necessary that the fact appear in some form, else the pleading is fatally defective. See citations *supra;* also, 13 R. C. L. 902; 30 C. J. 107. On principle, the conclusion would seem to be sound. No presumptions obtain in favor of a criminal pleading. With respect to the crime charged, the pleading must be direct and certain, and if it be the rule that the victim of a wound received in a felonious assault must die within a year and a day from the time of the infliction of the wound to constitute criminal homicide, then the pleading, to conform to the requirement of certainty, must affirm that he did so die. The question

whether it is the rule of this jurisdiction that the death must ensue within a year and a day, seems not to have been judicially determined. It was suggested in the case of *State v. Champoux*, 33 Wash. 339, 74 Pac. 557, but the court held that the information did show that the death ensued within a year and a day, and did not notice the principal question. Nor does our statute directly enact the rule into law. It does provide, however, that the common law, in so far as it is not inconsistent with the laws of the state and not incompatible with its institutions or condition of society in the state, shall be the rule of decision in all of the courts of the state. It is also true that our statutes have declared as non-essential much of the technical precision necessary in a common law indictment, but it is still the rule that the pleading must contain a statement of the acts constituting the offense (Rem. Comp. Stat., § 2055) and must be "direct and certain, as it regards . . . the crime charged." (Id. § 2057.) We conclude, therefore, that it is the rule that death must ensue within a year and a day from the infliction of a mortal wound in order to constitute criminal homicide, and that the fact must be alleged in the indictment or information in order that a crime be stated.

Turning to the information here in question, we think it is at once apparent that the allegation with respect to the death of the person the appellant is accused of having murdered would be as true, did the death ensue after the year and a day from the infliction of the wound, as it would be did the death ensue within that time. And this being the effect of the allegation, it follows that the information is not direct and certain as it regards the crime charged. It is, on the contrary, indirect and uncertain with respect to a fact necessary to constitute the crime of murder. It will not do to say that the proofs may or will develop a crime, for

this is but to say there is no need of allegation at all.

It follows from the conclusion we have reached as to the sufficiency of the information that the judgment of conviction must be reversed. Since, however, the reversal on this ground is not a bar to a further prosecution for the same offense (Rem. Comp. Stat., §§ 2185, 2316), it is necessary to notice certain matters relating to the trial, of which complaint is made and which will become pertinent on a retrial of the cause.

The first of these relates to the identification of the accused. We have hereinbefore recited some of the circumstances surrounding the commission of the homicide, and have stated that the wife of the man killed was with him at the time of the killing. She was, however, unable to give more than a meagre description of the person who committed the crime. She observed his size and height and something of the characteristics of his movements, but did not discover his nationality. After the arrest of the accused she saw him in the county jail, and, of course, saw him in the court room at the time of trial. When called as a witness, she was permitted to testify that the accused resembled in his general appearance the person who killed her husband. A person was seen in the vicinity of the place of the homicide, a short time prior to the occurrence of the homicide, by two other persons. Neither of these was able to give more than a general description of the person they so saw, although one of them spoke to him and was able to say that he was of foreign nationality, possibly Italian. These witnesses also saw the accused at the jail and at the trial, and were permitted to testify that he resembled in size, in height, and in his general appearance, the person they saw near the place of the crime. The accused complains of the admission of this testimony, because,

as he avers, it is not sufficiently definite to have any probative weight. But we are clear that no error was committed in its admission.

[2] Any evidence tending to identify the accused as the guilty person is relevant and competent. It need not be in itself sufficient to support a conviction in order to be admissible; it is enough, if it has a tendency to that effect. Nor need the evidence be so far positive as to leave nothing but the credibility of the witnesses to be considered. Uncertainty in this respect affects only the weight of the evidence, not its admissibility, and certainly it has some bearing on the question whether the accused was guilty of the crime to show that the person committing it was of his general appearance, or to show that a person of his general appearance was seen in the vicinity of the place of the crime immediately prior to its commission. But it is particularly objected that the court allowed each of the several witnesses to state whether, in his opinion, the person so seen was the accused. There is possibly a difference in view among the several courts upon this question, but we have adopted the rule that, on the matter of the identification of men or things, such testimony is admissible. *State v. Miller,* 78 Wash. 268, 138 Pac. 896; *State v. Elliott,* 68 Wash. 603, 123 Pac. 1089; *State v. Morrow,* 63 Wash. 297, 115 Pac. 161, Ann. Cas. 1912D 570; *State v. Murphy,* 15 Wash. 98, 45 Pac. 729.

Harry Hallen, the person killed, was, for some time immediately prior to his death, the assistant superintendent of a manufacturing plant situated in the city of Tacoma. During the time that he was such, one Nick Kramer was foreman of a department of the plant. For some months prior to January 18, 1921, Spadoni, the accused, was an employee of the plant, working in the department of which Kramer was fore-

man. On the date last given, Spadoni was discharged under the orders of Hallen, the reason assigned being the slackness of work in the plant. Kramer personally notified Spadoni of his discharge, stating to him the reason for the discharge, and saying to him that he might again be reemployed when work at the plant revived. At the time of his discharge Spadoni made some remark in the Italian language, which was translated to the foreman at the time by another workman as being to the effect that Spadoni was "not satisfied to be discharged, and thought he wasn't treated right." At later times he expressed his dissatisfaction to others, and stated that some time he would find out the cause. On January 27, 1921, late in the evening, as Kramer entered his sleeping room in a private dwelling house, he was fired at through the window of the room by some person from the outside of the dwelling. The bullet from the fire-arm used struck an alarm clock which Kramer then held in his hands. Investigation subsequently made showed that the bullet which struck the clock was of .32-20 calibre, and of the kind commonly used in a revolver known as a Smith & Wesson. After this shot was fired, Kramer changed his sleeping apartment to another room in the house. On the night of February 3, 1921, some person fired through the same window into the bed in which Kramer formerly slept. Investigation disclosed that the bullet was of .45 calibre and of a kind commonly used in the United States army revolver of the model of 1911. Hallen, as we have before stated, was killed on the night of March 11, 1921. Bullets and cartridges were found at the place of his killing. These were of .45 calibre of the character above described, and marks upon them indicated that they were fired from the same revolver that was used by the person who fired into the bed of Kramer. The trail of the person who killed Hallen

was traced from the scene of the killing, along a foot-path which led through a growth of brush a short distance from the scene. In September, 1924, this brush caught on fire, and in the course of its burning it caused an explosion. In an investigation of the cause of the explosion, two revolvers were found lying in the vicinity of the foot-path in such position as to indicate that they were thrown or placed in the position in which they were found by some person passing along the path. One of these was a Smith & Wesson revolver designed to use bullets of a .32-20 calibre, and the other was a United States army revolver of the model of 1911, designed to use a bullet of .45 calibre. The larger of the revolvers was not traced to the possession of Spadoni. Concerning the other, it was shown that, at some time prior to his discharge as a laborer in the plant before mentioned, the accused endeavored to sell or trade to a fellow-countryman a Smith & Wesson revolver of the calibre of .32-20. The witness, however, did not pretend to say that it was the same revolver found alongside the footpath mentioned; all he would say was that it was a revolver of the same calibre, style and make.

Much of the foregoing was admitted in evidence over the objection of the accused, and his counsel contend in this court that it is for the greater part objectionable. Particularly, they complain of the evidence relating to the attempts on the life of Kramer, the admission in evidence of the bullets and cartridges found at the place of the attempts, and the admission in evidence of the revolvers found at the time of the brush fire. But, in homicide cases, the state has a wide latitude in the production of evidence. The general rule in this regard is well stated in the following excerpt from Ruling Case Law (Vol. 13, p. 906, par. 211):

"When a person is accused of a felonious homicide, it is both the right and the duty of the prosecution to give evidence of all those surrounding facts and circumstances which have any bearing upon the manner of the death, and any tendency to show whether it was natural, accidental, or felonious, and if the latter, whether the deceased was *felo de se,* or died by the hand of another. The jury should be given as complete a picture as possible of all the surroundings; and this, irrespective entirely of any question of subsequently connecting the defendant with the transaction by other proofs. Such evidence is a necessary preliminary to any which shall be offered to connect any particular person with the homicide; and the more full and complete the prosecution make it, the better do they discharge their duty to the public, and if he is innocent, to the defendant also. It is a universal rule of evidence, applicable to homicide cases as well as to other judicial proceedings, that all facts and circumstances upon which reasonable presumption or inference can be founded, as to the truth of the issue or disputed fact, are admissible in evidence. If the fact consist of parts, or is provable by many circumstances, each of which conduces something to the establishment of it, then each part, and each circumstance, is admissible, although the point will not be established until the whole fact is proved."

So, on the same subject, Mr. Wharton, in his work on Homicide (3d ed.), p. 895, says:

"And on this subject it may be stated generally that anything which will throw light on a homicide, and everything that might have influenced the mind of the person charged with committing it, may be shown in a prosecution therefor, and every fact from which the jury may legitimately deduce the guilt or innocence of the accused should be submitted to them, when, taken in connection with other facts, or all the other facts, its relevancy is made to appear."

[3] In our opinion, all of these facts had a bearing upon the question at issue. They tend to show that

the murder of Hallen was the result of a preconcerted plan. They tend to show that the assault upon Kramer was made by the same person who killed Hallen. They tend to show that the assaults were made by the same revolvers, and that one of these was the property of the accused. They tend furthermore to show motive, and to connect the accused with the crime for which he was being tried by showing that he had the same motive to take the life of Kramer that he had for taking the life of Hallen. Concerning the more particular objections, it is the rule, of course, that the state may not show that the accused committed other independent crimes, for the purpose of making it appear that he was wicked enough to commit the crime for which he is on trial, but the rule does not preclude the state from showing other crimes, where they are connected with the principal crime in such a manner as to show that each of the crimes was a part of one plan and was induced by the same motive. Always, the real question is, whether the matter shown has such a connection with the crime for which the accused is being tried as to tend to show that the accused committed that crime. Here, there was this connection. The revolvers were properly admitted in evidence as tending to elucidate and make more definite the oral evidence. More than this, they tended directly to connect the accused with the crime for which he was on trial. They tended to show that Hallen was killed by shots fired from one of the revolvers, that his murderer had at the time both revolvers in his possession; that the assaults on Kramer were made with the same revolvers; and that one of these was the property of the accused. The admissibility of the cartridge shells and the bullets needs no special consideration. They were but explanatory of other evidence.

[4] It is complained that the court too narrowly restricted the cross-examination of one of the state's witnesses. This witness was a police officer of the city of Tacoma, and it seems to be a violation of the city's ordinances for such an officer to accept a reward offered for the arrest and conviction of offenders. A reward had been offered for information that would lead to the arrest and conviction of the murderer of Hallen, and the witness was asked whether he had not offered to split this reward with a person, whom he suspected of having such information, if he would reveal his information. The court sustained an objection to the question, we think erroneously. It was a matter affecting his credibility.

[5] Many of the witnesses for the state were of Italian nationality, and testified through an interpreter. One of counsel for the accused was familiar with the Italian language, and, during the examination of a witness, he complained to the court that the interpreter was not giving the correct English version of the witness's testimony. The court deemed that the remedy was by cross-examination of the witness, and refused to entertain the objection, using language which partook somewhat of the nature of a rebuke. The accused complains, we think rightly, of the ruling of the court. It was the interpreter, and not the witness, of whom the complaint was made, and it hardly seems possible that the interpreter's mistakes could be corrected by cross-examination. It may be, as the state argues, that counsel did not make the point of his objection clear to the court, which would possibly permit its passing under the condition of the present record. But the same condition is likely to recur on another trial, and, if it does recur, the court should take such action as will ascertain the truth of the charge, and rebuke counsel only when he persists

in the objection after it is ascertained that it is not well founded.

[6] The accused called a Mrs. Falconer for the purpose of establishing an alibi. She testified that she, with the accused and others, was in a store on a principal street of South Tacoma, when the ambulance passed which carried Hallen to the hospital after he was wounded; and that the accused was in the store continuously for some hours immediately prior to the passing of the ambulance. Continuing his direct examination, counsel for the accused asked her the name of the first person she told that the accused was in the store at that time. To this question an objection was interposed on the ground of immateriality, which objection the court sustained. While complaint is made of the ruling of the court, we find no error in it. When a witness is impeached by showing that he has made statements prior to the trial contradictory of his testimony given at the trial, which tend to prove that his testimony is of recent fabrication, it may be shown in his support that, shortly after the occurrence of the events which he narrates, he made statements to others confirmatory of his narrative, but such testimony is not admissible under any other circumstance. It is evident, it is true, that the question propounded was but preliminary to something else, and true, also, that the court refused to permit counsel to state in the record what he expected to prove by this line of questioning, but it is plain that its only purpose could have been to support the witness by showing prior statements made by her confirmatory of her testimony on the trial.

[7] One Lupori was called as a witness on behalf of the state, and gave testimony to the effect that the accused had admitted to him that he (the accused) was

the person who killed Hallen. On cross-examination, he was asked whether or not he remembered an occasion, the date of which was given, when one of the accused's attorneys, together with a Mr. Gianelli, visited him at his place of business in the town of McCleary. Answering in the affirmative, he was then asked if the attorney did not on that occasion make known to him his (the attorney's) relations with the defendant, tell him he knew he was to be a witness for the state, and tell him further that he wanted nothing from him but the truth. After answering these questions affirmatively, he was asked if he did not say to the attorney, in the presence of Mr. Gianelli, in answer to an inquiry as to his knowledge of the case, that he knew nothing about it, except that at one time the accused offered to sell him a gun. The witness answered the last question in a roundabout way, but his answer was, in substance and effect, that he made no such statement. On his defense, the accused called Gianelli and sought to prove by him that the witness did make the statement imputed to him by the question. A number of questions were put to the witness embodying the idea in different forms, to all of which the court sustained objections made by the state. It is our opinion that the court erred in its ruling. In the usual case, errors of this sort are of not very great moment, but here it was particularly pertinent. The testimony of Lupori was the most damaging to the accused of all of the testimony introduced by the state; in fact, if it was true it left but little doubt of his guilt. Under these conditions the accused should have been permitted to bring to the jury any circumstance, however slight, which tended to impeach him.

It was shown that the accused left the state of Washington about the middle of the year 1921, going to the state of California. From the time he reached

the latter state up to the time of his arrest, he worked for different employers in San Francisco and its immediate vicinity. While there, he became acquainted with an Italian family by the name of Pardini. The family consisted of a father, mother, and a grown daughter. The accused boarded with the family, and their relations were for a time friendly and intimate. The father and daughter were witnesses for the state. They, the father more particularly, testified to conversations and admissions made by the accused, which tended strongly to show that he at least had guilty knowledge of the murder of Hallen. On cross-examination, they both admitted enmity towards the accused, and admitted he had been ordered to leave their home, the father saying that the enmity arose because the accused had put poison into cough medicine which the daughter was taking. As a witness in his own behalf, the accused denied making the statements and admissions imputed to him, and gave another version of the trouble between himself and the Pardini family. His story was that the trouble arose over money matters. He had made a loan to the elder Pardini in the sum of $900, to aid him in building a house, for which sum he held the note of Pardini; that Pardini promised him when the loan was made that he would give him a mortgage on the house, when it was completed, as security; that Pardini, on the completion of the house, refused to give him the promised mortgage or pay the loan prior to the maturity of the note; that, subsequently, he again asked for the money because he desired to send it to his family in Italy, and was again refused; and that the trouble between himself and Pardini arose over these matters, and was the cause for which Pardini ordered him to leave his home. On rebuttal, the state re-called both Pardini and his daughter, and the court permitted them to testify over objection that

their enmity towards the accused arose from the fact that he had put poison into the cough medicine the daughter was taking, and that this was the reason he was ordered from the Pardini home. This manifestly was error. It is true, a witness may sometimes be impeached by showing that he has, on prior occasions, made statements contradictory of the evidence he gives at the trial, but, before even this may be done, the testimony given must be material to the issue on trial.

[8] A witness may not be questioned as to collateral matters and then be impeached because he does not make true answers. On questions of this sort the state is bound by his answers. *State v. Payne,* 6 Wash. 563, 34 Pac. 317; *State v. Melvern,* 32 Wash. 7, 72 Pac. 489; *State v. Carpenter,* 32 Wash. 254, 73 Pac. 357; *State v. Stone,* 66 Wash. 625, 120 Pac. 76. Where the defendant is the witness, the rule is not different. When the defendant takes the stand and gives testimony in his own behalf, he may be cross-examined as an ordinary witness, but, like the ordinary witness, the state is bound by his answers when the questions pertain to collateral matters. In this instance, the accused was not on trial for a crime committed against the daughter of Pardini. This was a matter collateral to the issue on trial, and the state had no more right to contradict his answers concerning it than it had to contradict his answers concerning other matters not pertinent to the issue.

In the cross-examination of the accused the following appears:

"Q. Spadoni, you are 32 years of age? A. Thirty-one. Q. How old were you when you left Italy? A. I was eighteen. Q. Why did you leave Italy? Mr. Gagliardi: We object to that as incompetent and immaterial. A. To get a better position. Q. Is that the only reason you left Italy? A. That is all. Q. Were you

ever in trouble over there for killing a man? Objection; overruled; exception. (No answer.) Q. Were you ever in trouble in the old country for killing a man? Objection; overruled. A. Never killed nobody. Q. Didn't you spend eight months in jail for killing a man? Objection; exception. A. Not for killing a man. Q. Isn't that why you left the old country? A. No, sir.''

On his redirect examination, the accused was permitted to explain that he was arrested on suspicion of having killed a man, and was kept in confinement for a period of time because of such suspicion, but that at the end of that time the actual culprit was discovered and he was discharged. One of the state's counsel in his opening argument, commenting on this testimony to the jury, made use of these words:

"Now, my friends, what have we before us. We have before us a young Italian, 32 years of age, who lived in this country for some twelve years, who for more than four years immediately prior to this trial has been in the city of San Francisco and Oakland, California, a man who came to America because he was suspicioned of murder.''

The accused's counsel objected to the latter part of the statement, and asked the court to instruct the jury to disregard it. The court denied the request in the following words: "Your exception allowed; your motion denied. He has the right to make an argument.'' The trial court, we think allowed the state to exceed the bounds of proper cross-examination, when it permitted inquiry as to the commission of another and distinct crime, since the rule is that the state may show only the conviction of another crime to affect the credibility of the witness. Since, however, the accused answered all of the questions negatively, and as the state was bound by his answers, it is possible that the error might be passed as not prejudicial. But we are

afraid that, in this instance, the error was emphasized. The testimony of the accused was all that there was upon the matter, and he did not say that he "came to America because he was suspicioned of murder." His answer was, in substance, that he was arrested on the suspicion of having killed a man, and was subsequently exonerated; stating further (a matter we have not heretofore noticed) that he came to America on a passport issued by the Italian government, and was subsequently allowed to become a citizen of the United States. The ruling of the court was, in its effect, a confirmation of the idea that the evidence was pertinent and for the consideration of the jury, whereas it should have instructed them that it was not a matter for their consideration. In the turn the circumstance was allowed to take, it could not have been otherwise than error prejudicial to the accused.

[9] The accused complains of certain of the instructions of the court, but these, as we view them, were in the main, correct statements of the law applicable to the issues, and we feel it unnecessary to review the objections in detail. The accused, however, offered evidence tending to show his whereabouts on the night Hallen was killed from early in the evening until after the killing occurred. The evidence, if believed, was convincing of the fact that he was not the murderer. The court made the matter the subject of a special instruction. For its larger part the instruction is unobjectionable, but the jury were told that such a defense "may be easily fabricated," and should be considered with "great caution and care," and "receive rigid scrutiny." The defense that the defendant was in another place, at the time of the commission of the crime with which he is charged, is a proper and legitimate defense, and it is not the rule that the evidence thereof is inherently subject to greater suspicion as to

its truth than is other evidence given in the cause. It should not, therefore, be made the subject of special animadversion by the court, but should be submitted to the jury as other evidence is submitted, leaving it to the jury to say whether the evidence as a whole satisfies them beyond a reasonable doubt of the guilt of the accused. Again, we think the instruction falls within the ban of the case of *State v. Thompson,* 132 Wash. 124, 231 Pac. 461.

[10] There were certain requested instructions, which the court did not give in the language in which they were framed. This was not error. In this jurisdiction the trial judge is permitted to instruct the jury in words of his own choosing, and if he thereby covers all that is material in requested instructions or fully informs the jury as to the law of the case, error is not committed. In this instance there was a compliance with these requirements.

The judgment is reversed and the cause remanded for such further proceedings as shall be meet in the premises.

TOLMAN, C. J., MAIN, MITCHELL, and HOLCOMB, JJ., concur.