[No. 37042.    Department Two.    September 10, 1964.]

THE STATE OF WASHINGTON, *Respondent,* v. DONALD G. PARR, *Appellant.*\*

*Dimmick, Sampson & Savage,* by *Anthony Savage, Jr.,* for appellant.

*Charles O. Carroll* and *Richard W. Pierson,* for respondent.

\*Reported in 395 P. (2d) 196.

DONWORTH, J.—Appellant presented no evidence in his joint trial with another on a charge of armed robbery of a Seattle pharmacy. The appeal is from the judgment and sentence entered upon the conviction for the offense charged.

In order to consider appellant's two assignments of error, we must set forth the substance of the state's evidence.

About 8:30 p.m., October 6, 1962, two unmasked men entered Kirk's Southland Pharmacy. At that time, only two persons were present. Mr. Kirk, the proprietor, was in the rear of the store listening to the radio, and Mrs. Webb, an employee, was in the front. When the men entered the store, she inquired if she could help them but they said that they wanted some prescriptions filled and proceeded to the rear.

Mr. Kirk testified that he saw the men enter the store, and, thinking that Mrs. Webb was waiting on them, he paid no further attention to them until he heard a noise. He started to investigate, when he was confronted by one of the men who was pointing a gun at him and told him that this was a stick up. His testimony described what happened next as follows:

" . . . I started to raise my hands, and he said, 'No, lay down on the floor', which I promptly did, and he said, 'No, I want you in the other room', meaning the back room, so I got up and he said, 'Call the girl', so I called Helen and she didn't quite understand, or at least I assume that I called Helen, let's put it that way, and then he said, 'In the back room'. I went in the back room and lay down on the floor and very shortly Helen was back there and she lay down on the floor along side of me. Q. Was this at their direction that you laid down on the floor? A. That is correct, yes, and then we were on the floor and this one lad said to the other, 'You stand over him with your gun', which the other boy did, stood straddle of my legs as I was laying on the floor. Q. Was this a different boy than the one who had led you back there? A. He was, yes, and then he stepped back and he asked me where the safe was and I told him it was right to his left, right around behind that little small partition and it was unlocked, which it was, then he went back there and the other lad was standing over, reached down in my billfold—in my hip pocket and took out my billfold and I told him to take the money but

I would appreciate getting my billfold back, which he did. Q. How much was in the billfold, about how much? A. Two dollars, but anyhow, after this boy had been back of the safe, he came back and stood to one side of us and said, 'Is there a back door?' I said, 'Yes, there is, right behind you, and it is locked', then he asked me where the telephone was and then I told him. He stepped around to the prescription case. I didn't see him again.

"The lad standing over me said, 'There are customers, and we will wait on them.'

"That is the last I ever heard of them at all. They were gone."

Mrs. Webb's testimony as to what she was doing meanwhile was:

"A. I was straightening the gum on the gum rack. Q. Then what happened? A. Well, I noticed—I could see out of the corner of my eye Mr. Kirk was lying on the floor, and at that particular moment I saw neither one of the fellows and I didn't know what he was doing, so I asked him what he was doing and then he got up and his hands were in the air and I still—neither one of the fellows—and I didn't realize what was happening and he called me, then I realized somebody was standing behind of me with a gun in my back. He turned around and he said for me to move to the back of the store, so I did. Q. Where did you go after you saw these—were both individuals you saw armed? A. Yes. Q. And where did you go after that? What did they tell you to do again? A. He told me to go back to the store —to the back of the store. Q. Were they both together at this time? A. No. No. I don't know what happened to the other one. Q. You got to the back of the store and then what happened? A. Well, there was only the one way you had, that was to the back room and then I did, and then I saw to my right the other fellow was standing and had a gun. I didn't look at him. I knew he was there. Q. What happened after you got in the back? A. Mr. Kirk was lying on the floor to my left facing down and he said, 'Lay down beside him', and I did. Q. And then what happened after you and Mr. Kirk were lying face down on the floor? A. The fellow that had walked me to the back of the store held a gun on us and the other one asked where the safe was.

"Mr. Kirk told him. He said he wanted it opened and Mr. Kirk said it was open so he went back there and I could hear him rattling around back there taking whatever was in there, then he asked did we have a back door and

Mr. Kirk said yes but it was barred and locked and he wanted to know did—where was the telephone, and Mr. Kirk told him and he, I guess, went back, I don't know. They said, 'Well, there was some customers' and they would go wait on them for us and they left the back room."

According to Mr. Kirk's testimony, after the men left he found that all the money in the safe and in the cash register was gone besides some checks and narcotics. He estimated that the amount of cash taken was $3,581.51.

Appellant's first assignment of error is stated in his brief as follows:

"The trial court erred in admitting the testimony of Detective T. F. O'Leary as to the defendant's statement that he had thrown two pistols in Hicks Lake on October 8, 1962."

Detective O'Leary testified that he participated in appellant's arrest in his apartment at 1:30 a.m., October 9, 1962. He testified (over an objection as to materiality) that he had had a conversation with appellant about two pistols.[1] The detective's testimony was as follows:

"Q. And what—did you ask him, or, was there any conversation about the whereabouts of a couple of pistols? A. Yes. I asked him where these two pistols were. Q. And did he make a statement to you about that? A. At the time he told me he had thrown them into Hicks Lake. Mr. Dixon: I have no further question. Cross-examination by Mr. Savage: Q. And which two pistols were these supposed to be? A. Well, there were two pistols that we were looking for when we arrested him. Q. When you arrested Mr. Parr, did you have any idea that he was going to be charged with the robbery of Kirk's pharmacy on October 6th? A. No, sir. Q. You had no suspicion at that time that he was at all implicated in that robbery? A. No, sir. Q. And your questioning of him about these pistols had nothing to do with Kirk's? A. No, sir."

In the absence of the jury, appellant's counsel moved for a mistrial because of the above-quoted testimony. This motion was denied by the trial court. Counsel then moved that the testimony be stricken from the record. The court

[1] By special verdict, the jury found that appellant was armed with a deadly weapon at the time of the commission of the crime charged.

reserved its ruling thereon until the close of the state's case.[2]

When the state's case was closed, appellant's counsel renewed his motion for a mistrial and his motion to strike the testimony of the detective concerning appellant's statement regarding his disposition of the two guns. After hearing the arguments of both counsel at some length, the trial court denied the motions.

■ In his argument in support of his first assignment of error, appellant states that he has found no decision of this court that is directly in point. He refers to several of our decisions such as *State v. Duree,* 52 Wn. (2d) 324, 324 P. (2d) 1074 (1958), where a weapon allegedly used in the commission of a crime was admitted in evidence. Although not positively identified as the weapon used by the defendant, there was testimony that it generally resembled the one used.

Appellant's position is stated in his brief as follows:

"Thus, in every case, this court has held that it is not necessary to positively identify the weapon introduced in evidence as being the same one used in the commission of the crime in question, but that testimony that it resembles the criminal weapon as to style, caliber, make or appearance is necessary. If it is necessary to identify a weapon to this extent, surely testimony concerning an unidentified and unconnected weapon is inadmissible.

"The only relevant factor contained in Detective O'Leary's testimony was that the weapons allegedly disposed of by the defendant were thrown away on October 8, 1962, two days after the robbery. . . ."

In this connection, we should have in mind the state's evidence relating to the identification of appellant as the man who forced Mr. Kirk at the point of a gun to lie down on the floor in the back room of the pharmacy.

---

[2]Detective O'Leary was recalled after the argument on appellant's motions for mistrial and to strike the portion of his previous testimony and further testified: ". . . Do you recall approximately when he said he had thrown those guns into the lake? A. To the best of my recollection it was the day prior to the arrest." This testimony, if believed by the jury, would fix the time for disposing of the pistols as the second day after the robbery.

Incidentally, it was stated at the oral argument in this court that Hicks Lake is near Olympia.

At the time that Detective O'Leary's testimony as to appellant's statement regarding the disposition of two guns was admitted in evidence, the state had already presented the testimony of Mr. Kirk and Mrs. Webb identifying appellant as using a gun in the commission of the robbery of the pharmacy. They had also testified that his companion had used a gun in aiding and abetting him therein.

Appellant contends that, since his codefendant's confession described two guns used in the robbery as a revolver and an automatic (one being of .38 caliber), the detective should have been asked to testify whether the guns which he was looking for were similar to those used in the robbery.

As shown by the above-quoted testimony of Detective O'Leary on cross-examination, at the time appellant was arrested the arresting officer had no suspicion that he was implicated in the robbery of Kirk's Southland Pharmacy.

Furthermore, the codefendant's confession describing the guns was not obtained until October 30, 1962, which was 3 weeks after appellant's arrest. Consequently, there is no factual basis for appellant's contention that Detective O'Leary should have been asked, during his testimony, for a more detailed description of the guns, which appellant admitted to the arresting officer to have thrown into Hicks Lake 2 days prior to October 9, 1962.

We think that the trial court did not err in admitting the testimony regarding the guns in evidence, since appellant's admission as to his destruction of them was material to the issues. The weight to be attached to that testimony was for the jury to determine. *State v. Duree, supra; State v. Jensen,* 114 Wash. 401, 195 Pac. 238 (1921); *State v. Spadoni,* 137 Wash. 684, 243 Pac. 854 (1926); see, also, annotation in 68 A.L.R. 1191.

Appellant's second assignment of error is:

"The trial court erred in admitting the testimony of Gene Tomlinson that on October 8, 1962, the defendant paid $500.00 cash down on the purchase of a new automobile."

The testimony referred to in this assignment was that of an automobile salesman who stated that, on October 8, 1962, appellant came to his place of business where he

purchased a 1962 Chevrolet convertible and paid $500 cash as a down payment. On cross-examination, the witness stated that appellant had been in the same salesroom to look at cars either one or two days before that and stated that he was going to have some money and would return to buy a car. There was also testimony that, prior to the robbery, appellant had worked as a landscape gardener for Robertson Construction Company for a month and a half.

The admission of the testimony of the car salesman was appellant's second ground for his motion for a mistrial made at the close of the state's case. Appellant's counsel presented what the trial court referred to as "a formidable argument" in support of the motion. Nevertheless, the court, after stating his reasons at some length, denied the motions for a mistrial and to strike the evidence relating to the car purchase.[3]

The substance of the trial court's basis for its ruling was that appellant's statements constituted an admission against interest which were material to the issues before the jury and that the inferences to be drawn therefrom were for the jury to draw.

In discussing prior decisions of this court, appellant admits that the early case of *State v. Burns,* 19 Wash. 52, 52 Pac. 316 (1898), is contrary to his present position but contends that that case has been overruled by our more recent decisions. We cited the *Burns* case with approval in *State v. Barry,* 43 Wn. (2d) 807, 264 P. (2d) 233 (1953), so we cannot say that it has been overruled.

Appellant attempts to distinguish these cases on the ground that in each of them and, also, in *State v. Austin,* 60 Wn. (2d) 227, 373 P. (2d) 137 (1962), there was evidence tending to identify money in the defendant's possession as

[3] Appellant's counsel again presented his argument to the trial court on both grounds for mistrial (the admission in evidence of appellant's statement about throwing the guns into Hicks Lake and his two visits to the automobile agency) in support of his motion for a new trial or, in the alternative, for arrest of judgment. The trial court took the matter under advisement and later filed a 7-page memorandum opinion in which the court reexamined these questions and adhered to its original ruling in each instance.

being similar to coins or currency previously in the victim's possession. He contends that in the present case that element is entirely lacking. He further argues that neither is there any evidence that appellant was without funds prior to October 6, 1962, which would support an inference that his possession of $500 two days thereafter tended to show that he had suddenly come into possession of a substantial sum.

We regard these matters (as did the trial court) as bearing upon the weight to be accorded to the evidence rather than to its materiality. The state's case in regard to both appellant's assignments of error may have been weaker than the state's evidence in the decisions referred to above, but, nevertheless, the evidence in this case is material so the question of the weight to be given it should be left to the jury.

■ The rule stated in *State v. Harold,* 45 Wn. (2d) 505, 275 P. (2d) 895 (1954)—a case involving a different type of crime—is applicable here. We there said:

" . . . In *State v. Stevenson,* 169 Wash. 10, 13 P. (2d) 47, we said that the question of excluding evidence because of remoteness rests largely in the sound discretion of the trial court, and the ruling of that court will not be disturbed unless the evidence offered was so remote in point of time as to be immaterial. Ordinarily, remoteness affects the weight, rather than the admissibility of the evidence. . . . "

We are of the opinion that the trial court was correct in denying appellant's motions for a mistrial and in refusing to strike the testimony referred to above.

Finding that appellant's two assignments of error are without merit, the judgment and sentence are hereby affirmed.

OTT, C. J., FINLEY, WEAVER, and HAMILTON, JJ., concur.