[No. 37137.   En Banc.   September 24, 1964.]

THE STATE OF WASHINGTON, *Respondent*, v. HENRY LEROY GRAY, *Appellant*.*

*Fetty & Olwell*, by *David H. Olwell*, for appellant.

*Charles O. Carroll* and *James E. Kennedy*, for respondent.

HALE, J.—John Warren staggered to the front of the service station, collapsed to his knees, fell over on his back, and died. He expired shortly before noon, September 7, 1962, near the entrance to the Chevron station at 19th South and Yesler Way, Seattle—carrying on his body the ravages of nine separate knife wounds. One wound in his left shoulder was made with such violence from a downward stabbing motion that it had severed his collar bone and had sliced through his first rib to a depth of 3½ inches. Another wound, in his left chest, 5 inches deep, and a wound in his right chest, penetrating 3 inches, marked him for death. Any one of these three was fatal. Six other wounds put him beyond even temporary medical help. He had been stabbed completely through his left arm. Two wounds in his back, one below each shoulder where the knife had

*Reported in 395 P. (2d) 490.

been deflected by the shoulder blades, hastened death. One 3½ inch knife cut and a shorter wound, each on the top of the head, taken in connection with a slicing wound under the chin, gave mute testimony as to the savagery of the attack.

There were no eyewitnesses; bystanders nearby saw Warren stagger to the station front and collapse; they reached him at about the moment he expired. A few seconds earlier, Henry LeRoy Gray, the defendant, had been seen walking to a parked automobile. From there, defendant drove his car to a district where a woman friend of his lived; he parked his car a considerable and discreet distance from her apartment and stayed in the apartment until the police, after searching for him and questioning the residents of the neighborhood, located and arrested him in the apartment the next afternoon—about 28 hours after John Warren died.

Before the fatal attack, John Warren had operated an automobile repair garage at the rear of the service station lot. He had been working on a 1957 model Ford which had been left with him for repairs by one Edwin Jones. Defendant Gray, a few days before the killing, had demanded possession of the car, claiming to be the owner by virtue of a California title certificate. Warren refused to surrender the car, disputing the authenticity of the certificate and additionally claiming a mechanic's lien. Defendant had summoned police officers to the station and later consulted the sheriff's office for police assistance in getting possession, but they declined to adjudicate the matter and advised him to negotiate peacefully or seek redress in the courts.

After his interview with the sheriff's deputy, Gray again went to Warren's garage to do some repair work on another car and to discuss the release of the 1957 Ford. He says that, when he mentioned he was having some legal papers drawn up, Warren lunged at him with a knife but half tripped over an intake manifold lying on the floor; they grappled and fell to the ground together. Gray accounted for Warren's wounds by describing how each time Warren

tried to stab him, he would hold back Warren's knife hand, thereby evading the blow. He told the jury Warren stabbed and cut himself as Gray deflected the knife. He acknowledged that he probably got the knife away from Gray and threw it down. He said that in the struggle he received a cut in or near his left eye, which he later treated by applying a butterfly-type bandage, and injured his ankle so that it became swollen. Police officers said that they observed no signs of injury on defendant's person. Defendant, shortly after leaving the service station, washed his clothes with soap in cold water to remove the blood stains. He had been employed for several months in a Seattle hospital.

Defendant appeals the judgment and sentence of life imprisonment entered upon a verdict of guilty after trial under an information charging him with murder in the second degree.

Appellant makes three assignments of error, all of which go to the admission of a knife in evidence for illustrative purposes—a knife limited by the court to this purpose and withheld by the court from the jury during its deliberations upon the verdict. The lethal weapon actually employed in the killing was never offered in evidence by either the state or the appellant. The state's offer of an illustrative knife came about in this way:

Dr. Gale Wilson, a specialist in forensic pathology and autopsy surgeon for King County, performed an autopsy upon the body of John Warren. He gave detailed and specific descriptions of his professional observations, including measurements, showing the dimensions, shapes, locations and effects of the nine wounds. When asked to describe the type of weapon and the amount of force needed to inflict such wounds, he testified:

"The size and type of wounds that are shown here are those made with a knife which has one sharp edge and one blunt edge, and judging from the size, particularly of the wound in the arm and of the others, it would have a blade that would be three-quarters to an inch in width and it would have to be with a heavy back, in other words, a heavy blade, to go through the clavicle and the ribs the way that instrument did. That requires a lot of force."

He also testified that the knife could be one-half inch shorter in length than the deepest wound and the deepest wound in Warren was 5 inches.

When shown exhibit 7, the knife later offered by the state for illustrative purposes, and asked if a knife of that type would be needed to inflict such wounds, he said:

"I would say yes. It would have to be of size, or very close to it, and it would have to be about that heavy."

On cross-examination, he stated:

"It would be limited to any type of knife with a blade at least four and a half, four and three-quarter inches long; it could be longer. It would be approximately an inch wide and it would be a fairly heavy, stiff back, not a very thin, flexible type of thing. . . . If it were of the type that had only one cutting edge. There are some of those that are double edge, and I would say no to that."

To identify the knife and predicate its admission for illustrative purposes, the state called Gladys Gray, the appellant's former wife, who testified that she had married him in February, 1960, and divorced him in January, 1962. She said that prior to her marriage she had frequently seen the defendant in possession of a similar knife, which he carried on his person, and that she had seen the defendant after her divorce several times in which he carried the same knife. She said that the knife Gray carried before and after their marriage was almost the same in appearance as exhibit 7, except that the former had a yellow handle and the blade, while seeming to be of the same length, could have been one-half inch shorter in her estimation. She had last seen the yellow-handled knife carried by appellant in April or May, 1962, in the back of appellant's radio. In the company of the prosecuting attorney, she had picked out the knife (exhibit 7) at a store as being similar in size, shape, weight and kind to the one that appellant carried with him prior to and following their marriage.

In admitting the knife (exhibit 7) in evidence, the court told the jury that it had been allowed for purposes of illustration only; that this knife was illustrative of a kind of

knife, and that it was not to be deemed a knife that was in any way involved in the wounding of John Warren.

Was it error to admit the knife (exhibit 7) for illustrative purposes? Appellant says that, there being no evidence to connect it with the crime charged, it was immaterial and irrelevant and prejudicially inflammatory.

█ Courts should approach the admission of models, samples and things offered exclusively for illustrative purposes with wariness and circumspection, to the end that fact be not confused with fancy and artistic interpretations push aside and take over the role of truth unadorned. A ruling designed to allow the admission of a model house in evidence should guardedly preclude an air castle, even though the two may have cogent similarities. Thus, models, samples and objects offered in evidence for purely illustrative purposes must not only be relevant and material in character to the ultimate fact sought to be demonstrated by their use, but, additionally, must be supported by proof showing such evidence to be substantially like the real thing and substantially similar in operation and function to the object or contrivance in issue. If the proffered evidence does not meet this test it should be rejected.

Exhibit 7, the knife shown to the jury as depicting the kind of knife in size, shape and weight which under the evidence could have been employed by the assailant in inflicting the wounds, met those requirements. Evidence supplied by the autopsy surgeon, who, after giving a detailed description of the dimensions, shape and location of the wounds, concluded that in his opinion the knife offered by the state for illustrative purposes could have inflicted the wounds described, furnished a strong support for its admission. This evidence, when combined with that of Gladys Gray, defendant's former wife, that, during the time before their marriage and for an interval of time after their marriage, she had on numerous occasions seen defendant in possession of a similar knife—the model differing from the observed knife only as to the color of its handle—fulfilled the tests of competency, materiality and relevancy for illustrative purposes. Tests fixed by case and text

authority for admitting a weapon in evidence prima facie support this view. *State v. Duree,* 52 Wn. (2d) 324, 324 P. (2d) 1074; *State v. Spadoni,* 137 Wash. 684, 243 Pac. 854; *State v. Mosley,* 136 Wash. 674, 241 Pac. 294; *State v. Jensen,* 114 Wash. 401, 195 Pac. 238; 2 Wharton's Criminal Evidence (12th ed.) § 673; 3 Wharton's Criminal Evidence (12th ed.) § 855.

■ Appellant assigns separate error to the testimony of Gladys Gray, concerning his possession of the knife from May, 1959 to February, 1960, the period of time prior to their marriage, urging that possession of a knife during this period is too remote in time to the date of the offense charged, September 7, 1962, and is, therefore, irrelevant. Whether possession of a particularly described knife in February, 1960, is too remote from acts occurring on September 7, 1962, to be relevant and, therefore, inadmissible need not be decided here. The same witness gave further testimony that she saw the same knife in defendant's possession several times after their divorce in January, 1962, and thus narrowed considerably the period of claimed remoteness. We do not rule that the time prior to marriage was too remote to be considered relevant, but we do say that that evidence, when added to the testimony concerning the period following the divorce, appreciably shortened the time during which remoteness becomes an issue. Questions of relevancy and materiality arising under a claim of remoteness present problems to be resolved through the exercise of sound judicial discretion. Appellant points to no basis, nor do we find any in the record, from which error in exercising this discretion was shown.

Affirmed.

OTT, C. J., HILL, FINLEY, WEAVER, ROSELLINI, HUNTER, and HAMILTON, JJ., and CUSHING, J. Pro Tem., concur.

---

November 5, 1964. Petition for rehearing denied.