[No. 27082. Department One. August 29, 1938.]

THE STATE OF WASHINGTON, *Respondent,* v. RUTH ELIZA-
BETH HENKE, *Appellant.*[1]

*Paul Lamargie* and *Carl K. Heussy,* for appellant.

*B. Gray Warner* and *Albert D. Rosellini,* for respond-
ent.

[1]Reported in 82 P. (2d) 544.

SIMPSON, J.—An information filed by the prosecuting attorney of King county charged the defendant therein named with the crime of murder in the first degree.

Upon arraignment, in addition to a plea of not guilty, the defendant, through her attorney, entered a plea of insanity to the effect that, at the time it was charged the crime was committed, she was insane or mentally irresponsible, and the insanity and mental irresponsibility still existed.

The trial by jury resulted in a verdict of guilty as charged in the information, together with a special finding that the death penalty be not inflicted. The court then entered judgment sentencing the defendant to life imprisonment in the state penitentiary. From the judgment and sentence, the defendant has appealed.

Appellant's assignments of error are the denial of her motion to withdraw the first degree murder charge from the jury on the ground that there was not sufficient evidence to support the same, the refusal of the court to inquire into the appellant's mental condition at the time of her trial and at the time the judgment and sentence were passed upon her constituted an abuse of discretion, and the denial of her motion for a new trial on the ground of irregularities in the proceedings of the court.

The record discloses the following facts: Appellant and deceased, William Henke, were married during the year 1925. William Henke was a stock salesman by occupation, but had not been financially successful for several years just prior to the time of his death. November 19, 1937, he consulted with his friend Otto A. Erdvig relative to a new business venture which would require a trip to California in order to raise necessary funds. Appellant insisted that she should make the

trip with her husband, but was told by him that sufficient money could not be obtained to pay the expenses of both. Thereupon, discussion of the matter was discontinued.

November 19, 1937, with the permission of Mr. Erdvig, appellant and her husband went to his room in a Seattle hotel for the avowed purpose of taking a bath. After they had been in Mr. Erdvig's hotel room for about an hour, shooting was heard by another guest of the hotel. Investigation disclosed that William Henke had been shot four times, and was found in the hotel hallway near the room occupied by himself and wife. Appellant shot herself above the left breast and was found seated on the floor near the door of the room with a revolver by her side. The revolver had been purchased by appellant several months before the shooting took place.

When the police officers arrived, appellant admitted the shooting and gave as her reason that she felt the lives of herself and husband had come to an end, and she had taken this means to rid the world of "two no accounts." Several times thereafter, she asked for the gun so that she might end her own life. William Henke was taken to a hospital, and just prior to his death November 23, 1937, made a dying declaration in which he stated that he and appellant had gone to the room to take a bath and that they had started arguing over the proposed trip to California, and that when he told appellant she could not go, she pulled a gun and shot him four times.

The evidence relative to appellant's mental condition shows that prior to May 19, 1930, appellant and her husband were happily married. They had a nice home, he was prosperous, and she was a beautiful woman, bright and intelligent, and able to make her own living by engaging in various kinds of work. On that day,

May 19, 1930, she and her husband were involved in an automobile accident in which appellant was seriously injured. As a result, she was unconscious for seven or ten days, and for a considerable time thereafter was highly excitable and irritable.

Her physical defects marred her facial expression and interfered with her walking and the use of her hands. Her memory was defective, and her intellectual capacities were greatly reduced. Her doctors, friends, and relatives described her many eccentricities and the peculiar ideas that she developed after the accident. This evidence showed that appellant's actions, appearance, personality, and outlook on life had completely changed; that she became dull, helpless, and peculiar; and that she did many strange and unusual things. She attempted to take her own life on several occasions, threatened to take the lives of others, and questioned the mentality of her husband and mother.

Many of the doctors and other witnesses testified, after reciting the peculiarities and conditions just referred to, that she did not at the time of the shooting know the difference between right and wrong, nor was she able to realize what she was doing. The matrons at the city and county jail watched appellant after the time of the shooting and before the trial, and testified that appellant was mentally unsound. Dr. A. W. Hackfield, a specialist in neuralgia and psychiatry, beginning in November, 1937, made twelve or more examinations of appellant and talked with many of her friends and relatives from whom he secured the history of her mental condition. His conclusion was that appellant did not know right from wrong at the time she killed her husband.

The state's evidence, secured from the police officers who handled the case, was to the effect that appellant

gave to them an intelligent account leading up to the occurrence at the hotel, explained to them her reasons for her acts, and that she knew what had happened. These men had a long experience in dealing with persons accused of crime. It was their opinion that appellant was sane when she committed the acts charged in the information.

Dr. S. N. Berens, a specialist in brain surgery, who attended appellant after her automobile accident, testified to her mental condition much to the same effect as other witnesses, that she was not in possession of her normal faculties, but said that at times she was able to distinguish between right and wrong, but could not do so at other times.

Dr. Edward D. Hoedemaker, a specialist in mental and nervous diseases, testified he examined appellant November 23, 1937, and two different times thereafter in the jail, and that she gave him a history of her life, including the automobile accident and the events leading up to the shooting. The doctor said she answered questions readily when they were unrelated to the wounding and death of her husband, and,

"On the basis of my examination, I said that there is no evidence of mental illness present. There is no evidence of any mental illness having been present at the time of the accident or since with the exception of a reactive depression of the crime due to the death of her husband—the reaction that anyone would have following a sorrowful incident. That was my conclusion based on the three times that I saw her."

The conclusion of the witness was that, on the night of November 19, 1937, appellant could tell the difference between right and wrong.

The ability to distinguish between right and wrong test of sanity or insanity was first announced in *M'Naghten's Case*, 10 Clark & F. 200.

This court has approved that test of insanity with

respect to one's mental condition as of the time of the commission of a crime. *State v. Craig,* 52 Wash. 66, 100 Pac. 167, and *State v. Schafer,* 156 Wash. 240, 286 Pac. 833. See, also: I Wharton, Criminal Law (12th ed.), 72, § 52; 16 C. J. 100, § 75.

In *State v. Craig, supra,* we stated:

"Insanity being a question of fact, whenever it appeared from all the evidence bearing on the question that a person charged with crime did not have the mental power to choose between right and wrong with reference to the particular act charged, he was of unsound mind, and if such affection was the efficient cause of the act and if he would not have committed the act but for that affection, he should be acquitted; for one with such mind is *non compos mentis.* and entitled to the protection of the law."

There was sufficient evidence, if believed by the jury, to warrant its verdict, which, in effect, decided that appellant was legally sane at the time she killed her husband.

It is next urged that the trial court abused its discretion in the manner in which it inquired into the mental condition of the defendant at the time of the trial and when judgment and sentence was imposed.

Attorneys for appellant contend in this regard that she was, insane during the trial and at the time sentence was pronounced, and that the insanity consisted of her mental incompetency to make a rational defense. They urge that the court committed error in not submitting the question of present insanity to the jury; and second, it abused its discretion by failing to appoint a commission to determine the appellant's present sanity and in using the wrong rule to ascertain appellant's mental condition.

The court properly instructed the jury relative to the defense of insanity or mental incompetency at the time the act was committed.

Instruction No. 22, given in accordance with the provisions of Rem. Rev. Stat., § 2175 [P. C. § 9295], was in part as follows:

"If you acquit the defendant of the crime charged because of insanity or mental irresponsibility, you will so find in your verdict and will further find whether or not such insanity or mental irresponsibility exists at this time, . . ."

The verdict of the jury finding appellant guilty as charged rendered unnecessary the answers to the special interrogatories.

An accused person cannot be lawfully tried, convicted, or sentenced while he is in a state of insanity, even though he were sane at the time of the commission of the crime.

It will be observed that the relevant statute, Rem. Rev. Stat., § 2175, provides only that in the event of an acquittal shall a special verdict be returned passing upon the question of insanity at the time of the trial, but there is no statute in effect in this jurisdiction providing the mode for the determination of the question of insanity during the course of the trial in the event the defendant is found guilty.

Relative to the question of ascertaining the fact of sanity at the time of the trial, we said in *State ex rel. Mackintosh v. Superior Court*, 45 Wash. 248, 88 Pac. 207:

"Criminal courts are possessed of an inherent power to ascertain whether one accused of crime is sane and able to avail himself of all his constitutional rights during the progress of his trial. The respondent Judge having such power, exercised it, before placing these women on trial. In so doing he endeavored to proceed in substantial compliance with Bal. Code, § 2660 (P. C. § 5546), that being the most pertinent statute we have upon the subject. Insanity not only protects an accused from conviction for crime, but present insanity when established also affords sufficient reason

why he should not be placed on trial or, if he has been tried, convicted, and sentenced, why the judgment of the court should not be executed upon him."

See, also, *State v. Peterson,* 90 Wash. 479, 156 P. 542; *State v. Schrader,* 135 Wash. 650, 238 Pac. 617, 243 Pac. 10; *State v. Vann,* 84 N. C. 722; *Barrett v. Commonwealth,* 202 Ky. 153, 259 S. W. 25; *State v. Deschamps,* 41 La. Ann. 1051, 7 So. 133.

It is clear that the trial court may use its own discretion in the manner of ascertaining the mental condition of an accused person, either during the time the trial is in progress or after the trial when the accused is before the court for sentence.

The trial court did not abuse its discretion in refusing to appoint a commission to examine appellant. *State v. Peterson, supra.*

■ Appellant urges that the court at the time of sentence based its conclusions regarding appellant's sanity upon the rule of her ability to distinguish between right and wrong. Counsel for appellant, however, earnestly contends that, in ascertaining the sanity of a person while being tried, a different measure must be applied from that which relates at the time of committing the criminal act; that, while the ability to distinguish between right and wrong is. a proper measure to be applied with regard to a person's mental state at the time of the commission of the act, the measure of mental capacity at the time of the trial and sentence is the ability of the accused properly to appreciate his peril and rationally assist in his own defense.

This court has never been called upon to determine the test of the sanity or insanity of a defendant during the trial or at the time of judgment. Since there is no statute relating to the test of sanity or insanity of the

defendant during the course of the trial, we must revert to the common law test.

The general rule at common law is that the test of a defendant's present sanity during the trial and at the time of sentencing is not the right and wrong test, but the test is whether one is capable of properly appreciating his peril and of rationally assisting in his own defense. If he is not, then the defendant is of such unsound mind that he may not be tried, sentenced, or punished.

"The capacity to be tried,—which must exist at the time of the trial, differs from that for crime required when the wrongful act was done. If an indicted person is not sane, the court cannot go on with the case; or if he becomes insane after the trial commences, he can neither be sentenced, nor, if sentenced, punished, while his insanity continues." I Bishop, Criminal Law (9th ed.) 292, § 396.

The following cases have approved this rule: *Commonwealth v. Woelfel,* 121 Ky. 48, 88 S. W. 1061; *People v. Geary,* 298 Ill. 236, 131 N. E. 652; *State v. Brodes,* 156 La. 428, 100 So. 610; *Hawie v. State,* 125 Miss. 589, 88 So. 167; *United States v. Harriman* (S. Dist. N. Y.), 4 Fed. Supp. 186; *Commonwealth v. Scovern,* 292 Pa. 26, 140 Atl. 611; *Commonwealth v. Cilione,* 293 Pa. 208, 142 Atl. 216; Annotation 3 A. L. R. 94; *Freeman v. People,* 4 Denio (N. Y.) 9, 47 Am. Dec. 216; *Jordan v. State,* 124 Tenn. 81, 135 S. W. 327, 34 L. R. A. (N. S.) 1115; *People v. West,* 25 Cal. App. 369, 143 Pac. 793; *Marshall v. Territory,* 2 Okla. Crim. 136, 101 Pac. 139; *Youtsey v. United States,* 97 Fed. 937.

Our concern is whether the trial court abused his discretion in deciding that appellant was sane during the trial and at the time of sentence.

It having been established that the accused was sane at the time of the commission of the crime, such condi-

tion is presumed to continue until the contrary is shown. *In re Brown,* 39 Wash. 160, 81 Pac. 552, 109 Am. St. 868, 1 L. R. A. (N. S.) 540; *State ex rel. Thompson v. Snell,* 46 Wash. 327, 89 Pac. 931, 9 L. R. A. (N. S.) 1191.

In *Marshall v. Territory, supra,* the court stated:

"A person is presumed to be sane in ordinary affairs. After indictment the presumption of sanity continues until it is called in question from a reputable source and a sufficient specific declaration to the contrary."

The court at the time he sentenced appellant made some remark indicating that the sanity of the appellant at the time of the trial had been passed upon by the jury. However, a careful examination of the instructions given clearly shows that the jury was neither instructed to pass upon the sanity of the appellant during the course of the trial, nor given the test of sanity which appellant urges is applicable during the course of a trial or at the time of meting out the sentence.

Nevertheless, the following statement made by the trial court makes it clear that he earnestly and conscientiously considered the question relative to appellant's present mental condition:

"If I felt in my own heart that this defendant was mentally irresponsible at the time of the trial or now, I certainly would not proceed with the sentencing of this defendant but I do not have that doubt in my own mind, and, I think, under the legal definitions as to mental irresponsibility, this defendant has had a very fair trial and I think the verdict of the jury is amply justified by the evidence."

There is nothing in the record indicating that the court adopted the wrong rule when he made his final decision.

The court had the advantage of observing the demeanor of the appellant during the five days of the trial, and saw and listened to the various witnesses,

both lay and expert, who testified concerning appellant's mental condition, which was not shown to have changed during the time of the trial.

We are convinced the appellant had a fair and impartial trial, and that the trial court exercised properly his discretion relative to her mental condition at the time of the trial and sentence.

The judgment is affirmed.

STEINERT, C. J., MAIN, HOLCOMB, and GERAGHTY, JJ., concur.