[No. 29817.   Department One.   June 20, 1946.]

THE STATE OF WASHINGTON, *Respondent,* v. EARL VICTOR
BRUCE HARTLEY, *Appellant.*[1]

[1]Reported in 170 P. (2d) 333.

*Will Lanning* and *Bill Lanning,* for appellant.

*Lloyd Shorett, J. Edmund Quigley,* and *Herbert H. Davis,* for respondent.

STEINERT, J.—By information charging him with murder in the first degree, defendant, Earl Victor Bruce Hartley,

was accused of killing his wife, Ida Hartley, in the manner set forth in the charge as follows:

"He, the said EARL VICTOR BRUCE HARTLEY, in the County of King, State of Washington, on or about the 11th day of August, 1945, with premeditated design to effect the death of Ida Hartley, a human being, wilfully, unlawfully and feloniously did then and there cut, slash, and wound the said Ida Hartley, with a knife then and there held by him, the said EARL VICTOR BRUCE HARTLEY, thereby mortally wounding the said Ida Hartley, from which said wounds the said Ida Hartley then and there died."

Defendant entered a plea of not guilty and a special written plea of mental irresponsibility at the time of the alleged commission of the crime charged. The jury returned a verdict of guilty and, by a special finding, recommended the death penalty. After denying a motion for arrest of judgment or for a new trial, the court entered judgment on the verdict, fixing therein the date of execution. Defendant appealed and will hereinafter be referred to as the appellant.

At the time alleged in the information, appellant was approximately forty-seven years of age. According to his testimony, his past military record comprised five months of Mexican Border service during the year 1916, and seventeen months of active service as an instrument repairman in World War II. Upon his return from the African area, in November, 1943, he was temporarily hospitalized for some suggested mental trouble, but was later released and, at about the same time, was given an honorable discharge.

His first wife, Iona L. Hartley, whom he had married in 1928, and by whom he had two children, now fifteen and sixteen years of age respectively, separated from him in April, 1944, on account of his physical abuse of her, and, with the two children, went to Los Angeles, where she later procured a divorce from him on the ground of cruelty.

In May, 1945, appellant married Ida Hartley, a woman several years his senior. She had been married four times before, and, at the time of her marriage to appellant, possessed several thousands of dollars in cash, various real

estate properties including a suburban home and certain business locations, and also some investments in the form of mortgage holdings.

The house which the couple occupied as a home after their marriage, and which belonged to Mrs. Hartley, is located south of the city of Seattle and is situated on the east side of a private driveway leading northwardly from 140th street, a distance of about two hundred eighty feet. The property on the opposite, or west, side of the driveway is owned by George D. McLain and Lillith McLain, his wife. The McLains' residence is about two hundred feet north of 140th street. At the time involved in this action, the McLains were having constructed a new house on the west side of the driveway, about sixty feet from 140th street.

At a point just off the east side of the driveway, opposite the McLain residence and about thirty feet south of the Hartley habitation, stood a trailer which appellant's brother, William C. Hartley, and his wife, Rachel C. Hartley, had been occupying as a home since their marriage in June, 1945. The two Hartley women, sisters-in-law, had known each other for about thirty years and were good friends.

Appellant and his wife Ida owned two large knives of the bolo type. One of these knives was about twenty-four inches long, weighed approximately one pound, six ounces, and had a blade about two inches wide at its outer extremity. This knife was commonly referred to as "her knife." The other knife was about twenty-one inches long, weighed approximately two pounds, seven ounces, and had a cutlass-shaped blade nearly three inches wide and, at its back edge, a quarter of an inch thick. This knife was commonly referred to as "his knife." Both knives had scabbards. Appellant and his wife usually kept these knives in their bedroom, one on each side of their bed, allegedly as a means of protection against possible intruders.

All of the four Hartleys were given to drinking, the appellant and his wife being constant and heavy consumers of intoxicating liquor. The record also shows that appellant was of a very quarrelsome nature and frequently exhibited an ill humor. On one occasion, five or six weeks before the

fatal event here involved, while Mrs. Rachel Hartley was visiting Ida Hartley in the latter's home, appellant came out of the bedroom and in an angry manner threatened to cut their heads off with a "brush hook," having reference to "his knife." About two weeks later, while appellant was driving his wife's car, and being then accompanied by her and Rachel Hartley, a quarrel arose between appellant and Ida Hartley. Becoming exceedingly angered, appellant, while driving at a speed of twenty-five or thirty miles an hour, pushed his wife from the car onto the highway, as a result of which her head was severely cut. Immediately thereafter he seized hold of Rachel Hartley with one hand and, while maintaining the same rate of speed, shoved her out of the car, as a result of which she was severely injured. Both women were taken to a hospital and there treated. An effort was made to arrest the appellant, but he could not then be located.

There were frequent quarrels between appellant and his wife, usually over money matters, and, when the wife refused to give him more money or was slow in advancing it, he became very angry and abusive. On one or two occasions, she had him arrested because of his abuse and assaults, but, when those matters came up in court for hearing, she relented and allowed him to be freed without punishment.

On Friday, August 10, 1945, which was the day before the homicide, appellant and his wife spent the afternoon in White Center doing some marketing and drinking beer in a tavern. They returned home late in the evening with a quantity of liquor and spent several hours in drinking. About 2:30 in the morning, August 11th, they went over to the trailer occupied by William C. Hartley and his wife, Rachel. William Hartley was not at home at the time, but arrived shortly afterward. Rachel Hartley had already retired, but was awakened by her visitors and admitted them. The party of four spent the rest of the night, until about eight o'clock in the morning, drinking two quarts of wine and a quart of whisky, which appellant and his wife had brought with them.

About ten o'clock in the morning, the group of four left the premises and proceeded in Ida Hartley's car toward Seattle. Their immediate object was to take Rachel Hartley to a doctor for treatment of former injuries. Appellant and Ida Hartley also had in mind visiting a number of beer taverns before returning home. Ida Hartley had upon her person twenty-two hundred fifty dollars in cash.

On the way to the doctor's office, the party stopped at Riverside Tavern. The two men and Ida Hartley went into the tavern, but Rachel remained in the car and awaited their return. After about a half-hour, she became annoyed at the delay and left the car, going on foot to her doctor's office. Her husband also abandoned the party shortly afterwards, and appellant and his wife proceeded onward together, visiting one beer tavern after another until about two p. m.

While in a tavern in the vicinity of Sunnyside, they became engaged in a quarrel with each other over money matters, and a witness overheard appellant say to his wife: "If you don't give me the money, I'll kill you." Mrs. Hartley thereupon took eighteen hundred dollars of her money and gave it to the proprietor of the tavern for safekeeping, taking his receipt therefor. The couple then departed, and next appeared at Andy's Tavern, on the old Seattle-Tacoma highway, about two miles from their home. After having several drinks, they were refused further service. During their stay at that place, Mrs. Hartley turned over to the proprietor four hundred dollars for safekeeping and took a receipt therefor.

At this point, appellant wanted to return home, but Mrs. Hartley was unwilling to go. After some argument, appellant parked the automobile at the rear of the tavern, handed the keys to Mrs. Hartley, and proceeded home on foot, arriving there about five o'clock in the afternoon.

The witness McLain, who was superintending the construction work upon his new house, saw appellant come down the driveway and enter his home. About fifteen minutes later, McLain saw Mrs. Hartley get out of her car at 140th street and walk down the driveway toward her place of residence. McLain was then standing on his prop-

erty, near the driveway, about one hundred seventy-five feet distant from her, and had a clear view of what thereafter transpired. What we are now about to relate is the substance of the testimony given by Mr. McLain, Mrs. McLain, and Jack Sutton, a thirteen-year-old boy, all of them being eyewitnesses.

Mrs. Hartley walked down the private driveway and approached the trailer, situated opposite the McLain residence. She tried the door, but, finding it locked, turned toward the driveway. At that instant, appellant, who was lying in wait among the weeds back of the trailer, arose therefrom and rapidly followed her. Overtaking her in the driveway, he struck her a blow upon the back with the smaller one of the bolo knives, termed "her knife," and felled her to the ground. While she was lying on the ground and screaming, he struck her another blow and then sat down upon her.

Mr. McLain, seeing what was taking place, approached within twenty-five feet of the immediate scene and called out: "I would not misuse her that way," whereupon appellant arose and, with the knife resting upon his shoulder, slowly and steadily advanced toward McLain and in a threatening manner said: "You are looking for trouble, are you?" McLain thereupon replied: "No, I am not," but remonstrated with appellant regarding his conduct. At the same time he retreated toward the front of his residence.

During this interruption, Mrs. Hartley got up from the ground and ran toward the back porch of the McLain residence screaming for help. Mrs. McLain came out from her kitchen onto the porch, where she saw Mrs. Hartley in the act of sitting down, with blood streaming down her dress, and the appellant standing by her with the knife upon his shoulder. Hartley raised the knife at Mrs. McLain in a threatening manner, but, at that instant, Mr. McLain came hurriedly around the house and, seeing the situation, hastily pulled his wife from the porch.

The McLains, hand in hand, made a hasty retreat toward a neighbor's house several hundred feet away. While traversing that distance, they looked back and saw

the Hartleys about twenty-five feet from the porch. Appellant was in the act of swinging the knife, completing the movement with a blow upon the back of his wife's head. She fell forward to the ground, whereupon appellant struck her another terrific blow upon the same portion of her body. He then sat down beside his wife and patted her on the shoulder.

The witness Sutton, who was mending a pair of stilts, witnessed the entire occurrence and corroborated the McLains in every detail. All of these witnesses testified that, although appellant gave evidence of having been drinking, in their opinion he was not drunk, but acted throughout with deliberation, though with a display of great anger.

The neighbor to whose house the McLains had fled immediately called the sheriff, and, within a very few minutes, two deputies arrived. After arresting appellant and placing handcuffs upon him, the officers obtained from him his story of the affair, told to them in a calm and deliberate manner. He said that he had killed his wife; that she "had it coming"; and that the only thing he was sorry for was that he had not used the larger knife, "his knife." The officers quoted him as saying: "I used her knife on her, but I didn't do a very good job, and with my knife just one swing and her head would roll down the driveway where I wanted it to go." He also stated that the act was premeditated; that he had planned it for a long time; and that he had intended to use the larger knife, but by chance had seized the wrong instrument. He later pointed out the larger knife in the grass where he had lain in wait for his victim.

Subsequently, that same night, appellant made a written statement detailing the events of the crime, corroborating the verbal account which he had previously given. The officers all testified that, although appellant gave evidence of having been drinking, he was very calm and deliberate in telling his story within a very few minutes after the commission of the offense.

In his testimony upon the trial, appellant described in detail his activities and those of his wife on the day of the homicide, up to the time of Mrs. Hartley's return home, but,

from that point on, he said that he could not remember anything, or at least had but a hazy recollection of the events. His defense of mental irresponsibility was based largely upon the record of his past life as given by him.

While we have gone to some length in relating the circumstances connected with this gruesome affair, the record is, of course, much more extended, but all of it corroborates and emphasizes the details above narrated.

One of appellant's assignments of error is that the trial court erred in overruling his demurrer to the information. The contention is that the state's pleading is defective in that it failed to allege that Ida Hartley died within a year and a day of the time of the infliction of the wounds, and that the words "from which wounds the said Ida Hartley then and there died," as used in the information, are too indefinite and uncertain to meet the alleged requirement. Support for this contention is sought in Rem. Rev. Stat., § 2057 [P.P.C. § 132-9], which provides that an indictment or information must be direct and certain regarding

" . . . (1) the party charged; (2) the crime charged; and (3) the particular circumstances of the crime charged, when they are necessary to constitute a complete crime."

The information in this case definitely charges that, on the 11th day of August, 1945, in King county, Washington, appellant, with premeditated design to effect the death of Ida Hartley, did wilfully, unlawfully, and feloniously "then and there" cut, slash, and wound her with a knife, "then and there" held by the appellant, from which wounds Ida Hartley "then and there" died. The information was filed August 20, 1945, nine days after the commission of the crime.

This language clearly and plainly expressed the charge that on August 11, 1945, in King county, Washington, appellant inflicted upon Ida Hartley wounds from which she died on that day in that county. There can be no possible misunderstanding of the intent and meaning of the language used, namely, that the infliction of the wounds and the death of the victim all occurred on August 11, 1945, in King county.

Appellant cites the case of *State v. Spadoni,* 137 Wash. 684, 243 Pac. 854, from which he quotes the following excerpt:

"We conclude, therefore, that it is the rule that death must ensue within a year and a day from the infliction of a mortal wound in order to constitute criminal homicide, and that the fact must be alleged in the indictment or information in order that a crime be stated."

The facts in that case were unusual, as pointed out and distinguished in the case of *State v. Stone,* 169 Wash. 233, 13 P. (2d) 427, wherein this court said:

"The *Spadoni* case was an unusual one in that the information therein alleged that Spadoni, in Pierce county, Washington,

" ' . . . on or about the 11th day of March, Nineteen hundred and 21, then and there being, unlawfully and feloniously and with a premeditated design to effect the death of Harry Hallen, a human being, did shoot a pistol loaded with powder and ball at and into the body of the said Harry Hallen, and thereby mortally wounding the said Harry Hallen, from which mortal wounds the said Harry Hallen *did die*; and that such killing of the said Harry Hallen as herein alleged was neither excusable nor justifiable. . . . '

"It is to be noted that the crime charged was that of the murder of the deceased on March 11, 1921, and he was formally charged with the crime on April 10, 1925, *nearly four years and one month after it had been committed.* Although the information charged that the felonious assault with the premeditated design to effect the death of the deceased occurred in Pierce county *more than four years before,* there was no allegation that the death occurred in Pierce county, Washington, or that it occurred within a year and a day after the assault was committed. It was there observed that, at common law, to constitute a felonious homicide the death of the person receiving a mortal wound must ensue within a year and a day from the time of the infliction of the wound, which was regarded as a matter of substance, material to the issue, and if death did not result within the prescribed time the offense was not a felony, as the common law conclusively presumed that the wound was not the cause of the death, and proofs were never admitted to show to the contrary." (Italics ours.)

Continuing further in the *Stone* case, *supra,* this court said:

"The primary and accepted meaning of 'then', according to Webster, is 'at that time.' It also has a secondary meaning, 'soon afterward, or immediately.' The primary and accepted meaning of 'there', according to Webster, is 'in or at that place.' "

Giving further emphasis to the intent and meaning of the words "then and there," as used in an information, this court also made the following statement in the *Stone* case, *supra*:

"Moreover, this case is like the case of *State v. Champoux,* 33 Wash. 339, 74 Pac. 557, where the allegation of the information as to when the death occurred after the assault was much more defective than in the instant case. It was there alleged that the assault was made on November 5, 1902, and that the deceased 'then and there languished and languishing died,' and the information being filed on November 8, 1902, it was held that the allegation of the information was sufficient to charge that the death, although after alleging that the deceased languished, occurred within a year and a day after the assault."

To the same effect, see *State v. Bezemer,* 169 Wash. 559, 14 P. (2d) 460.

Assuming, for the sake of the argument, that the common-law rule is applicable under our statute, we nevertheless hold that, in this instance, the information was sufficient to satisfy the requirements of Rem. Rev. Stat., § 2057.

We next consider appellant's assignment of error upon a ruling of the trial court permitting the state, over appellant's objection, upon rebuttal, to introduce evidence of appellant's sanity.

In his defense, appellant produced a physician, specializing in neuropsychiatry, who, after an earlier examination of the appellant, testified that, in his opinion, appellant was unable to distinguish right from wrong at the time of the homicide. The state thereupon, in rebuttal, called Dr. D. A. Nicholson, a physician who for forty years had specialized in nervous and mental diseases, and who had examined the appellant on two prior occasions. He testified

that, in his opinion, appellant was not mentally diseased, and that, at the time of the commission of the offense, he was sane, knowing the difference between right and wrong.

■ Appellant's contention upon this assignment is that, in view of his plea of insanity, which was filed at the time of his arraignment, it at once became the state's burden to prove, upon its case in chief, that appellant was sane at the time of committing the crime, and that, upon rebuttal, the state could not offer proof of his sanity but was limited to a showing that the opinion expressed by appellant's expert witness on that subject was not in fact the true opinion of that witness.

We are unable to adopt that view of the law. The issue of insanity, or mental irresponsibility, was raised by the appellant in his plea and imposed upon him the burden of proving that defense by a preponderance of the evidence. *State v. Clark,* 34 Wash. 485, 76 Pac. 98, 101 Am. St. 1006; *State v. Harris,* 74 Wash. 60, 132 Pac. 735.

■ An accused person is presumed to be sane and to have been sane at the time the crime was alleged to have been committed; this presumption exists at the beginning of the trial and continues throughout the case until the contrary is shown by the evidence. *State v. Schafer,* 156 Wash. 240, 286 Pac. 833; 22 C. J. S. 899, Criminal Law, § 584; 20 Am. Jur. 159, Evidence, § 155.

■ A plea of insanity does not of itself constitute proof of the alleged mental condition, and the presumption of sanity therefore prevails until insanity is established by the degree of proof required. When affirmative proof of insanity is for the first time offered by the defendant in a criminal case, it becomes subject to the general rules of rebuttal testimony. Touching that subject, the rule is as stated in Underhill's Criminal Evidence (4th ed.) 998, § 484:

"After the prosecution has exhausted its case, and the accused has had a full opportunity to introduce all the evidence upon which he relies for an acquittal, the court may permit the introduction of rebutting evidence on the part of the state. By rebutting evidence is meant not merely evidence which contradicts the witnesses upon collateral and irrelevant points, or which is corroborative and con-

firmative of that which preceded it, but evidence which squarely meets and controverts some affirmative fact or facts which the adversary has attempted to prove. Material testimony offered by the state after the defendant has rested should not be excluded unless an unfair advantage over the defendant is obtained by its admission."

■ Under the rules hereinbefore stated, the evidence offered by the state in rebuttal was clearly competent and admissible.

■ The next assignment of error is directed to the giving of an instruction which reads as follows:

"Under the statutes of the State of Washington, no act committed by a person while in a state of voluntary intoxication shall be deemed less criminal by reason of such intoxication, but in a case such as this, where intent or purpose to commit the act charged is a necessary element of the crime, the jury should consider the matter of intoxication for the purpose of determining whether or not the intoxication was such as to render the defendant incapable of forming an intent or purpose."

Appellant does not contend that this instruction constitutes an incorrect statement of law, but takes the position that no issue of intoxication was presented by the evidence adduced at the trial, and, further, that the instruction may have led the jury to believe that, if the appellant was mentally irresponsible, such irresponsibility was nevertheless due to intoxication.

The record in this case reveals that, during the twenty-four hours preceding the commission of the offense charged, appellant and his wife together had been engaged in an almost continuous drinking bout, beginning at their home, then prolonged in the nearby trailer, and thereafter continued by visiting one beer tavern after another until two o'clock in the afternoon, three hours before the commission of the act charged. Whether, at the time of the homicide, appellant was inebriated to such an extent that he was incapable of forming an intent or purpose to commit the crime, was not only a question of fact to be decided upon the evidence, but also one which would determine whether premeditation, one of the necessary elements of the crime

as charged, had been proved. For that purpose the instruction was not only proper but also was favorable to the appellant. With respect to any possible effect that the instruction might have had upon the issue of insanity, that issue was separately and clearly covered by a series of other instructions given by the court, and we can perceive no basis for holding that the jury may have been confused by having the two issues submitted to it by these distinctly separate instructions.

The next assignment of error questions the legal sufficiency and propriety of instruction No. 5, wherein the court designated the four elements necessary to convict the appellant of the crime charged, as follows:

"(1) That the defendant on or about the 11th day of August 1945, did cut, slash and wound IDA HARTLEY with a knife. (2) That the defendant did this act with a premeditated design to effect the death of IDA HARTLEY. (3) That as result of said wounds so inflicted the said IDA HARTLEY languished and died on the 11th day of August, 1945. (4) That the said act on the part of the defendant occurred in King County, State of Washington."

The criticism directed against this instruction is that it failed to include the phrase "unless it is excusable or justifiable" employed in Rem. Rev. Stat., § 2392 [P.P.C. § 117-5], which defines the crime of murder in the first degree.

This court has often stated that instructions must be considered as a whole, and if, when so considered, they properly state the law and include all the elements which constitute the crime charged, they are sufficient, even though some one of them may omit some essential part. *State v. Denby,* 143 Wash. 288, 255 Pac. 141; *State v. Stratton,* 170 Wash. 666, 17 P. (2d) 621; *State v. Cox,* 197 Wash. 67, 84 P. (2d) 357; *State v. Refsnes,* 14 Wn. (2d) 569, 128 P. (2d) 773.

In line with that rule, instruction No. 20, given by the court, charged the jury as follows:

"It is the duty of the court to instruct you as to the law governing this case, and these instructions are given to you as one connected body and series and should be so regarded and treated by you, that is to say, you should apply the in-

structions as a whole to the facts proved and not select any single instruction alone and place undue emphasis upon it."

■ Supplementing instruction No. 5, quoted above, the first paragraph of instruction No. 3, given by the court, reads as follows:

"Under the laws of this state, the killing of a human being, unless it is excusable or justifiable, is murder in the first degree, when committed with a premeditated design to effect the death of the person killed."

This instruction incorporates the exact language used in Rem. Rev. Stat., § 2392, defining murder in the first degree.

It is thus apparent that the jury was fully and adequately instructed as to all the elements of murder in the first degree.

■ Furthermore, in this case there was no evidence whatever to support a defense, or even claim, of excusable or justifiable homicide, as those terms are defined by Rem. Rev. Stat., §§ 2404, 2406 [P.P.C. §§ 117-29, 117-33]. The omission of the words "unless it is excusable or justifiable" from instruction No. 5 was therefore harmless error, if error at all.

Appellant's final assignment of error relates to instruction No. 6, given by the court, which reads:

"The killing of a human being unless it is excusable or justifiable, committed with a design to effect the death of the person killed but without premeditation, is murder in the second degree.
*"There is no evidence introduced in the case under which a finding could be made by the jury that the killing of Ida Hartley was either excusable or justifiable."* (Italics ours.)

Appellant's exception and criticism are leveled at the italicized paragraph of this instruction, on the grounds (1) that it constitutes a comment on the evidence, in violation of Art. IV, § 16, of the Washington constitution, and (2) that it was equivalent to a direction to the jury to return a verdict of guilty.

As already stated, there was no evidence, and there is hardly any claim, that the homicide was excusable or

justifiable. Rem. Rev. Stat., § 2404, defines excusable homicide in these words:

"Homicide is excusable when committed by accident or misfortune in doing any lawful act by lawful means, with ordinary caution and without any unlawful intent."

Rem. Rev. Stat., § 2406, provides that a homicide is justifiable when committed either

"(1) In the lawful defense of the slayer, or his or her husband, wife, parent, child, brother or sister, or of any other person in his presence or company, when there is reasonable ground to apprehend a design on the part of the person slain to commit a felony or to do some great personal injury to the slayer or to any such person, and there is imminent danger of such design being accomplished; or

"(2) In the actual resistance of an attempt to commit a felony upon the slayer, in his presence, or upon or in a dwelling, or other place of abode, in which he is."

■ It is obvious that neither of these sections has any applicability to the evidence in this case. There being no evidence from which the jury could find that the homicide was either excusable or justifiable, the court properly decided as a matter of law that those issuable elements of the crime charged could not, and should not, be considered by the jury. That portion of instruction No. 6 cannot be considered as a comment on the evidence, because no evidence as to those features was presented.

An analogous situation was presented in the case of *State v. McPhail*, 39 Wash. 199, 81 Pac. 683, wherein the trial court instructed the jury that it might find the appellant guilty of murder in the first degree, guilty of murder in the second degree, or not guilty, but that there was no evidence in the case to support a verdict of guilty of manslaughter. Counsel for the accused in that case contended that the instruction was a comment on the facts, in violation of Art. IV, § 16, of the state constitution. In rejecting that contention this court said:

"It seems to us that counsel labor under an entire misapprehension as to the purpose and effect of this constitutional provision. It relates only to the manner of conducting trials

and submitting questions of fact to juries, and does not limit the power of the courts in the determination of questions of law. In this, as in all other jurisdictions, the court must determine the issues to be submitted to the jury from the pleadings and proofs, and in making such determination it decides matters of law and not matters of fact. If the court improperly withdraws an issue from the consideration of the jury, its ruling is erroneous, not because it is a comment on the facts, or a charge with respect to matters of fact, in violation of the provision quoted, but because it deprives the parties of a trial by jury, in violation of section 21 or section 22 of art. 1 of the constitution, which provide that the right of trial by jury shall remain inviolate, and that in criminal prosecutions the accused shall have a speedy public trial by an impartial jury.

"The provision upon which counsel rely applies to both civil and criminal cases, and, if they are correct in their contention, this court has been in error throughout its entire existence in holding that whether there is any testimony to support a cause of action or a defense presents a question of law for the determination of the court, and not a question of fact for the jury. The position taken by counsel is that the trial court must submit every issue raised by the pleadings to the jury, regardless of the state of the testimony or the absence of all testimony. This contention finds no support in our constitution or elsewhere, and cannot prevail."

The language just quoted can be applied with equal force and relevancy to the contention made by the appellant here.

Appellant's further contention that the criticized portion of instruction No. 6 amounted to a direction to the jury to return a verdict of guilty is equally without merit, because the forepart of the instruction still left the jury free to determine whether or not the homicide had been committed with a design, although without premeditation, to effect the death of Ida Hartley. Furthermore, the instructions as a whole enabled the jury to find the appellant guilty of murder in the first degree, guilty of murder in the second degree, or not guilty, and, in the event the jury found him not guilty, whether acquittal was because of his in-

sanity or mental irresponsibility at the time of the commission of the crime.

We find no error in the record, and the judgment is therefore affirmed.

BEALS, C. J., MILLARD, SIMPSON, and MALLERY, JJ., concur.

July 31, 1946. Petition for rehearing denied.

[1]Reported in 170 P. (2d) 314.