[No. 31678.   *En Banc.*   March 20, 1952.]

THE STATE OF WASHINGTON, *Respondent,* v. JOHN ANDREW
PUTZELL, *Appellant.*[1]

[1] Reported in 242 P. (2d) 180.

*Kennett, McCutcheon & Soderland* and *Montgomery, Montgomery & Purdue,* for appellant.

*Charles O. Carroll, Frank Harrington,* and *F. A. Walterskirchen,* for respondent.

SCHWELLENBACH, C. J.—John Andrew Putzell was charged with the crime of first degree murder by an information filed by the prosecuting attorney of King county.

Upon arraignment, in addition to a plea of not guilty, the defendant, through his attorney, entered a plea of insanity or mental irresponsibility at the time it was charged the crime was committed, and alleged that he had become sane or mentally responsible between that time and the time of trial.

The jury returned a verdict of guilty as charged, with a special finding that the death penalty be not inflicted. After denying motions in arrest of judgment and for a new trial, the court entered judgment sentencing the defendant to

life imprisonment in the state penitentiary, and this appeal follows.

Between eight and nine o'clock on the evening of August 31, 1950, Putzell, with two companions, was drinking beer at Irene's Tavern, located near First and Pine in Seattle. At a nearby table he saw Wilbur Higginson (the deceased), who was drinking beer with two companions. Higginson and his companions left and went to visit some other taverns, but later returned to Irene's. In the meantime, Putzell and his companions left. About ten o'clock, Putzell returned alone. He walked directly to the booth where Higginson sat and started shooting. Some of the shots went wild, but one apparently hit Higginson, because he started out to the front door holding his stomach. A taxi driver was sitting in his cab outside of Irene's. He saw Higginson running out holding his stomach. He said he wanted to go to the hospital. As the cab driver opened the door and was helping the victim in, Putzell ran out with a gun in his hand and pulled Higginson out of the cab. When the cab driver saw the gun he took off towards First avenue. As he was running he heard three or four shots.

Clarence Reese, one of Higginson's companions, testified that when the defendant started shooting in the tavern, he said: "You_____, I have got you now." Reese followed the two outside. He saw the defendant pull Higginson out of the cab and the latter fall on the curb. The defendant then pointed the gun down at him. Reese attempted to interfere and the defendant pointed the gun at him and asked him if he wanted some also. He backed up and saw Putzell fire three shots into Higginson, who was lying on his back.

Patrolman Roscoe arrived shortly after the shooting. He saw a man lying on the street and saw the defendant with a gun in his left hand, working with it. He grabbed the gun out of defendant's hand and defendant said: "Leave me alone. I have been after this guy for a long time and I'm going to get him."

Patrolman Waitt testified that he saw the defendant at headquarters. Defendant had a little plastic case in his hand.

He said: "You see that? That........................................ Inside are pieces of my skull. I got that when Higginson hit me over the head with a fire hose nozzle and left me on the deck to die. I have been looking for that guy ever since, and tonight I found him."

The defendant testified in his own behalf. He told of being assaulted by Higginson on March 8, 1948, while on a ship in Alaskan waters; that the assault was unprovoked and occurred as he was climbing a flight of stairs; that Higginson hit him over the head with a fire hose nozzle as he reached the top; that he fell back down the stairs and was unconscious from nine p. m. until ten a. m. the next day.

He further testified that, as a result of the assault, he was operated on and a piece of bone one-half inch square was removed from his head; that for seven or eight months thereafter his head felt as though ants were crawling around inside; that he had a feeling as if someone had put an iron band around his head and was exerting pressure on it; that he became extremely nervous and was afraid to ride on a plane or a bus, and that he could not sleep more than two hours a night. He testified that at times he would have "blackouts" and could not remember where he had been or what he had done. In this connection, it is rather significant that he was able to testify minutely as to his past life and, in telling of a trip to Portland, he went into detail as to every place he had been and as to every person whom he had seen on that trip.

July 20, 1949, he obtained a judgment against the Alaska Steamship Company and Higginson in the amount of $6,800 as damages for his injury. He testified that he met Higginson on First avenue in Seattle about a month after the accident and asked him why he had hit him, and that Higginson denied having done so. He also testified that he met Higginson again on June 2nd of the same year and told him that he was going to sue him; that he again met him in July, 1950; that there was never any trouble between them at these meetings.

He testified that a few days before the shooting he became "sidetracked"; that he found himself in Salt Lake City; that he had a faint recollection of thereafter being in Portland and taking a plane to Seattle and getting out of a bus at the Olympic Hotel. He testified that he remembered being in Irene's between seven and eight o'clock because he saw the clock above him while going to the restroom; that he remembered meeting his two companions there (giving their names); that from there they went to the Alaska Bar and then to the Forecastle Bar; that, during his first visit to Irene's he saw Higginson sitting at a table with two men and that Higginson stared and sneered at him. He testified that the next thing he remembered was being in the police car; that he did not remember the shooting.

Drs. Hale Haven, Robert M. Rankin, John B. Riley, and Hunter J. MacKay testified for the defendant. Drs. Howard Kaufman and Ralph M. Stolzheise testified for the state. They all specialize in neurology and psychiatry. Their testimony was based upon subjective symptoms given to them by the defendant, coupled with certain physical examinations as to reflexes, eyes, muscular co-ordination, nervous control, and an examination of an electro-encephalogram (a graphic tracing that is made by an electrical recordation of the activity of the brain). All the doctors, in response to lengthy and involved hypothetical questions, testified that in their opinion defendant was not mentally responsible at the time of the shooting. They based their opinion, in addition to the above, upon the probable inflammatory effect of alcoholic consumption by a person who has sustained a serious brain injury.

All of the doctors testified that, at the time of the trial, he was mentally responsible.

Drs. Riley and MacKay testified that, in their opinion, there was not a probability or likelihood of a recurrence or relapse of the condition of mental irresponsibility that would make defendant unsafe to be at large. Drs. Rankin, Stolzheise and Kaufman testified that there was such a likelihood of a relapse or recurrence of the mentally irre-

sponsible condition that the defendant was not safe to be at large.

No doctor testified that defendant could distinguish between right and wrong at the time of the shooting.

Appellant alleges the following assignments of error:

"1. The trial court erred in denying appellant's motion for directed verdict of not guilty of homicide and to have submitted to the jury only the question of whether or not appellant's mental irresponsibility was likely to recur.

"2. The trial court erred in refusing to instruct the jury to return a verdict of not guilty by reason of mental irresponsibility.

"3. The trial court erred in denying appellant's motion for arrest of judgment.

"4. The trial court erred in denying appellant's motion for a new trial.

"5. The trial court erred in imposing judgment and sentence on first degree murder.

"6. The trial court erred in admitting testimony of taking a knife and gun from the unconscious person of appellant on March 8, 1948.

"7. The trial court erred in failing to cure the prosecutor's misconduct in asking a question about the arrest and conviction of appellant for carrying a concealed weapon, or to grant a new trial.

"8. The trial court erred in failing to grant a new trial for the prosecutor's misconduct in commenting that the appellant could testify."

Appellant groups his first five assignments of error together and urges on appeal that the verdict of the jury finding him guilty implicitly and necessarily finds that he was mentally responsible at the time of the homicide, and that such finding is diametrically opposed to all of the undisputed testimony on the question of insanity.

Long and involved hypothetical questions were asked by counsel for both sides, each upon facts favorable to their own contention. The jury was not bound by the conclusions of the doctors in answer to these questions. The ultimate conclusion, and the ultimate decision as to the sanity or insanity of appellant, upon all of the evidence in the case, and the law, as given to it by the court, was the responsibility of the jury.

Appellant recognizes that there is a presumption that every man is sane, but he contends that the presumption of sanity, being an inference of fact, disappears completely when credible evidence of insanity is produced by the defendant, and that it then is incumbent upon the state to come forward with evidence to meet defendant's evidence of insanity, relying upon *Bradley v. S. L. Savidge, Inc.*, 13 Wn. (2d) 28, 123 P. (2d) 780.

■■ It is the duty of the state to prove, beyond a reasonable doubt, each of the elements of the crime charged. But that does not mean that the state must prove sanity. When a defendant interposes a defense of not guilty by reason of insanity or mental irresponsibility, that plea imposes upon him the burden of proving that defense by a preponderance of the evidence. *State v. Clark*, 34 Wash. 485, 76 Pac. 98; *State v. Harris*, 74 Wash. 60, 132 Pac. 735; *State v. Hartley*, 25 Wn. (2d) 211, 170 P. (2d) 333. In the latter case, we said:

"An accused person is presumed to be sane and to have been sane at the time the crime was alleged to have been committed; this presumption exists at the beginning of the trial and continues throughout the case until the contrary is shown by the evidence."

No assignment of error is made to the giving of any instructions. Instruction No. 22 was as follows:

"No. 22. Concerning the defendant's plea of insanity at the time of the alleged commission of the acts charged in the information, you are instructed that by such plea the defendant puts in question whether at such time he had such mental capacity or moral freedom to do or to abstain from doing the acts charged. Not every form of mental derangement, nor every unsound condition of mind, constitutes such legal insanity or mental irresponsibility. *The test is: Does a person have sufficient mental capacity at the time of the commission of an act to comprehend what he was doing and distinguish right from wrong with relation to such act?* If, under all the evidence, you fail to find that the defendant lacked such mental capacity, then said plea avails him nothing. If, on the other hand, you find from a preponderance of the evidence that, at the time charged in the information, the defendant was not possessed of suffi-

cient mental capacity or moral freedom to comprehend the nature of his acts, to distinguish right from wrong, and to abstain from the commission of such acts, then you should acquit the defendant upon the ground of mental irresponsibility." (Italics ours.)

As to that test we said in *State v. Henke,* 196 Wash. 185, 82 P. (2d) 544:

"This court has approved that test of insanity with respect to one's mental condition as of the time of the commission of a crime. *State v. Craig,* 52 Wash. 66, 100 Pac. 167, and *State v. Schafer,* 156 Wash. 240, 286 Pac. 833. See also: I Wharton, Criminal Law (12th ed.), 72, § 52; 16 C. J. 100, § 75."

█ The only exception taken to the above instruction was that it, with prior instructions, placed the burden of proving insanity on appellant.

The above instruction, including the italicized portion, became a part of the law of the case. Upon the submission to the jury it became its (the jury's) duty, by considering the evidence and the law as given to it in the court's instructions, to determine the guilt or innocence of appellant, and, as an incident thereto, to determine appellant's mental status at the time of the shooting.

We now turn to the sixth assignment of error. During the cross-examination of appellant concerning the occasion when he was hit on the head by Higginson on March 8, 1948, he denied that he carried a gun at that time. In rebuttal, the state put on two witnesses, one the chief officer of the ship, who testified that, while appellant was lying at the foot of the stairs where he had fallen, they took a gun and a knife from his pocket. Objection to this testimony was made on the ground that it was not material nor proper rebuttal, and was an attempt to impeach on a collateral issue. The trial court overruled the objection because of testimony of defense witnesses as to his being a peaceful, law-abiding citizen, saying: "This is some evidence which may be considered by the jury in rebuttal thereof, or as evidence tending to disprove the issue as presented by the defendant . . ." The court also held that it was not

impeachment on a collateral matter, in view of the testimony which defendant gave on cross-examination denying that he had a gun on him as he ascended the ladder.

■ Here appellant did not deny the shooting. His main defense was mental irresponsibility, and on this issue he attempted to prove that he suffered a brain injury, incurred as a result of a prior attack on him by deceased. The testimony of the doctors on behalf of appellant indicates that in their opinion the fact that appellant considered the attack unjustified and without provocation on his part was one of several factors, including an organic injury, which culminated in his alleged mental irresponsibility. To this extent, it became proper for the state to prove that appellant and not the deceased was the aggressor in the prior incident.

In attempting to prove that appellant was the aggressor, the state did not produce any witnesses to the affray, nor any testimony concerning his conduct or of any threats by him against Higginson, in connection therewith. It merely produced two witnesses who testified that, after he was knocked down the stairs, they found a gun and a knife in his pocket. Had the state produced witnesses to the affray, or testimony concerning his conduct, or threats made by him, then the testimony as to having found a gun and a knife in his pocket would have been material as tending to corroborate the other testimony. But standing alone, such testimony was not relevant or material as to the issue of whether or not appellant was the aggressor, and tended to invite the jury to guess, speculate and conjecture. See *State v. Fasick,* 149 Wash. 92, 270 Pac. 123; 274 Pac. 712.

■ Was the testimony proper as rebuttal of appellant's testimony in his own behalf, and that of his character witnesses, that he was a peaceful, law-abiding citizen? Appellant, having tendered the issue as to his law-abiding nature, was subject to rebuttal thereon, but not by specific acts of misconduct. In *State v. Carpenter,* 32 Wash. 254, 73 Pac. 357, in which case an accused had put into issue his reputation in this regard, we held that the state could introduce impeaching testimony

" . . . as to his general character in that regard, but this is as far as the rule could possibly go. No rule permits the general character of the defendant, even when directly put in issue, to be impeached by showing the commission by him of a specific crime other than the one for which he is on trial."

██ Nor was the evidence admissible as a contradiction of the appellant to impeach his veracity as a witness. Appellant, having taken the stand in his own behalf, was subject to the same rules of cross-examination as other witnesses. Although considerable latitude is allowed in cross-examination, the same latitude is not allowed in rebuttal of testimony so elicited. But, as indicated above, there was nothing to connect the gun with any material issue in the case. The inquiry was collateral, for it could not have been shown in evidence for any purpose independent of the contradiction. The test in that regard is set forth in *State v. Johnson,* 192 Wash. 467, 73 P. (2d) 1342.

"The rule is firmly established in this state that a witness cannot be impeached by showing the falsity of his testimony concerning facts collateral to the issue. In such matters, a party cross-examining the witness is concluded by the answers given. *State v. Carpenter,* 32 Wash. 254, 73 Pac. 357; *State v. Schuman,* 89 Wash. 9, 18, 153 Pac. 1084, Ann. Cas. 1918A, 633; *State v. Carroll,* 119 Wash. 623, 206 Pac. 563; *State v. Nolon,* 129 Wash. 284, 224 Pac. 932; *State v. Joffery,* 129 Wash. 322, 225 Pac. 48; *State v. Spadoni,* 137 Wash. 684, 700, 243 Pac. 854; *State v. Sandros,* 186 Wash. 438, 443, 58 P. (2d) 362.

"The test as to whether a matter is material or collateral, within the meaning of the rule, is whether the cross-examining party is entitled to prove it in support of his case. *State v. Stone,* 66 Wash. 625, 120 Pac. 76; *State v. Sandros,* 186 Wash. 438, 58 P. (2d) 362. In the case last cited, quotation was made from 6 Jones on Evidence (2d ed.), § 2400, wherein the following was declared to be the test: Could the fact, as to which error is predicated, have been shown in evidence for any purpose independently of the contradiction? Such, also, seems to be the test recommended in 2 Wigmore on Evidence (2d ed.), 435, § 1003."

In that case, we then concluded:

"The evidence, being inadmissible, was manifestly prejudicial to appellants and constituted reversible error."

■ Conceding, for the sake of argument, that the rebuttal testimony in question might have been material, still it should not have been admitted because its inflammatory nature so far outweighed any materiality it might have had as to be prejudicial. Here was a man being tried on a charge of first degree murder. His defense was that he was mentally irresponsible as the result of a prior unprovoked assault on him by the deceased, and in which occurrence he was not the aggressor. The state, to rebut that contention, introduced evidence of finding a gun and a knife in his pocket. The purpose of that testimony was to portray him as a vicious, quarrelsome man. The very inflammatory nature of this testimony leaves no margin for speculation as to whether or not the jury was swayed by it.

■ We have held in prior decisions that where the record shows that the accused had a fair trial, and that the alleged error could not possibly have resulted in prejudice, and his guilt is clearly established, we will not set aside a verdict for intervening error. Here, however, it is clear that the error complained of was so manifestly prejudicial that he did not have a fair trial.

We do not deem it necessary to consider the other assignments of error except to say that we are convinced of the good faith of counsel for the state in the matter and feel that such errors will not again occur upon retrial.

The judgment and sentence is reversed and remanded with directions to grant appellant a new trial.

HAMLEY, DONWORTH, FINLEY, WEAVER, and OLSON, JJ., concur.

GRADY, J. (dissenting)—I can agree with all that has been said in the majority opinion, except the part which states the inquiry made of appellant about carrying a gun at the time the deceased assaulted him was with reference to a collateral matter and was prejudicial to such an extent as to entitle him to a new trial.

When testifying as a witness in his own behalf, appellant told the jury about the assault made upon him by the deceased and its effect upon his subsequent mental condition. If his testimony with reference to the assault had been confined to the subject of mental condition, there would have been no purpose in asking him on cross-examination if he had a gun on his person when the assault was committed. But appellant was asked by his counsel if he had done anything towards Higginson to provoke the assault and he gave a negative answer. The only purpose of opening up this subject was to show that Higginson was the aggressor. The issue having been tendered by appellant, it was proper to ask him on cross-examination if he was armed when he and Higginson approached each other. If he denied such was the fact, the contrary might be shown on rebuttal. Proof of such fact would not be of any assistance to the jury in determining the mental status of appellant when he shot the deceased, but it was responsive to the claim made by appellant that the assault was unprovoked. The subject having been opened up, the state had the right to portray the whole picture.

Prior to the appellant becoming a witness, testimony had been submitted that his reputation for being a peaceable, law-abiding citizen in the community where he lived and worked was good. At the time the assault was made, appellant was traveling on a ship, which was on its way to the place where he resided. If appellant desired the jury to have the benefit of testimony as to his good reputation as a peaceable and law-abiding citizen, he would not be in a position to complain if it was made to appear that close to the time when his reputation was being built up he carried a gun on his person instead of transporting it among his personal effects.

I cannot agree that there was any attempt to impeach the veracity of appellant on a collateral matter, or that the inquiry made brought inflammatory matter of a prejudicial character into the case. The appellant had committed murder, which he did not deny. He sought to escape by the insanity route. He also wanted the jury to know he had

been the victim of a grievous assault by the deceased, hoping that such knowledge might afford in the minds of the jurors some justification of his act. He invited what followed in the way of rebuttal of an inference he wanted drawn that he was a defenseless victim of an assault by the deceased and the sympathy that might accompany knowledge of such fact.

However, even though it may be said there is room for a difference of opinion whether error was committed by the court, it was not of such a prejudicial character as to warrant setting aside the verdict of the jury. The facts surrounding the commission of the crime were so clear and convincing that letting the jury know appellant was armed when assaulted by deceased two and one-half years before he carried out his planned revenge could not possibly affect any inducement to a verdict that was inevitable.

Whenever we are called upon to review a record and are asked to set aside a verdict of a jury because of error in the reception of evidence, we may start out with a presumption the error was prejudicial, but if we can say after a full consideration of the record that, had the evidence been excluded, the jury would in all probability have rendered the same verdict, its admission will be held not to have been prejudicial. This method of determination whether error may or may not have been prejudicial should not be used where the accused has been deprived of some substantial right, or where it appears he has not had a fair and impartial trial on the merits. Whether the error complained of in a given instance was or was not prejudicial, must depend upon the circumstances of the particular case rather than on any specific rule of law. The general attitude of the courts with respect to the subject is stated in 24 C. J. S. 841, Criminal Law, § 1887, as follows:

"Accordingly, the appellate courts are disposed to regard as harmless intervening errors where it appears from the record that the conviction is clearly correct on the merits; where it appears on the whole case that substantial justice has been done; where the record shows that accused had a fair trial; where the record conclusively shows that the alleged error could not have resulted in prejudice; where

from the whole record the guilt of accused appears to be clearly established; where no other verdict could have been returned on the evidence, and where the conviction was just and would have been reached if the errors had not been committed. So, also, where it can be said from the record that the errors complained of could not reasonably have affected the result of the trial, they may be regarded as harmless, and this particularly where proof of accused's guilt is clear."

Owing to a lack of understanding as to the attitude of appellate courts in determining whether error was or was not prejudicial, differences of opinion on the subject arose in *State v. Redwine*, 23 Wn. (2d) 467, 161 P. (2d) 205, and *State v. Robinson*, 24 Wn. (2d) 909, 167 P. (2d) 986. However, in later cases, particularly the recent case of *State v. Wilson*, 38 Wn. (2d) 593, 231 P. (2d) 288, without stating the method of approach which gave rise to the differences of opinion in the two cases just referred to, we in fact considered the whole record and reached the conclusion that the verdict of the jury would in all probability have been the same even though the rejected evidence had been received. We held that the error was not of such a prejudicial character that would warrant granting a new trial.

In the cases cited in the majority opinion, we were able to conclude after a perusal of the records that, had the irrelevant inquiries not been made, the jury in all probability might have rendered different verdicts, and therefore the errors were prejudicial to such an extent as to warrant the granting of new trials. It is clear from the record before us that the admission of the evidence in all probability was not a factor that in any way influenced the jury in reaching a verdict of guilty. The appellant did not deny that he killed the deceased. On the question of mental irresponsibility, the jury rejected theory and accepted reality, which was within its province. The appellant had a fair and impartial trial, and I see no reason why the verdict of guilty should be set aside.

MALLERY and HILL, JJ., concur with GRADY, J.

---

April 30, 1952. Petition for rehearing denied.